(text box: 1) NO. 5-03-0333

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee,
 )  St. Clair County.

)

v. )  No. 01-CF-1118

)

PATRICK LEROY, )  Honorable

)  Robert J. Hillebrand,

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE WELCH delivered the opinion of the court:

The defendant, Patrick Leroy, was charged in the circuit court of St. Clair County with unlawful failure to renew his address registration as a child sex offender.  On February 5, 2002, the defendant pled guilty to the charge and was sentenced to one year's probation.  On August 27, 2002, a petition to revoke the probation was filed, charging that the defendant lived within 500 feet of an elementary school.  In an order issued December 27, 2002, the court found that the defendant admitted the charge, and the court ordered the defendant to move within 30 days.  A second petition to revoke the probation was filed on January 30, 2003, alleging that the defendant owed $40 in probation fees.  An amended petition to revoke was then filed, alleging that the defendant had not moved as ordered.  On March 7, 2003, the court entered an order finding that the defendant admitted the charge, and the court sentenced the defendant to 30 days in jail and 12 months' intensive probation.  At a hearing on April 11, 2003, the defendant stipulated that he lived within 500 feet of a school and that he was not the owner of the home but had lived there his whole life.  The defendant was 36 years old at the time of the hearing.  The defendant's mother owned the home in question, which is located in East St. Louis.  In an order issued April 17, 2003, the court found that the defendant was in violation of his probation.  On May 2, 2003, the court terminated the defendant's probation and prohibited him from residing at the home.  The defendant now appeals, contending that the statute he violated is unconstitutional in that the statute (1) violates the defendant's substantive due process rights, (2) violates the defendant's procedural due process rights, (3) violates the defendant's right to equal protection under the law, (4) is an 
ex post facto
 law, (5) violates the defendant's right against self-incrimination, (6) constitutes cruel and unusual punishment, and (7) is overly broad.  For the reasons that follow, we affirm the order of the circuit court.

The statute in question, section 11-9.4(b-5) of the Criminal Code of 1961 (720 ILCS 5/11-9.4(b-5) (West 2002)) (hereinafter subsection (b-5)), reads in pertinent part as follows:

"It is unlawful for a child sex offender to knowingly reside within 500 feet of a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age.  Nothing in this subsection (b-5) prohibits a child sex offender from residing within 500 feet of a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age if the property is owned by the child sex offender and was purchased before the effective date of this amendatory Act of the 91st General Assembly."

We begin our analysis of subsection (b-5) with the Illinois Supreme Court's pronouncement that "[a] statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity."  
People v. Malchow
, 193 Ill. 2d 413, 418 (2000).  A reviewing court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it can be reasonably done.  
Malchow
, 193 Ill. 2d at 418.  Whether a statute is constitutional is a question of law that is reviewed 
de novo
.  
Malchow
, 193 Ill. 2d at 418.  Against this backdrop, we now consider each argument raised by the defendant on appeal.

The defendant's first argument on appeal is that subsection (b-5) is unconstitutional because it violates the defendant's substantive due process rights.  Specifically, the defendant contends that he has a fundamental right to live with his mother and enjoy her support and that subsection (b-5) infringes upon that right because it prevents him from living with his mother.  The State counters that even if one assumes that the right of an adult male to live with his mother and enjoy her support is a fundamental right, subsection (b-5) does not prevent the defendant from living with his mother; rather, it merely prevents him from living with her at her present location, because that location is within 500 feet of a school.  Accordingly, the State would restate the defendant's argument as whether the defendant has a fundamental right to live with his mother and enjoy her support within 500 feet of a school, an argument the State says is without merit.

The plain language of subsection (b-5), quoted above, demonstrates that the statute does not dictate with whom a child sex offender may live; to the contrary, it merely restricts where, geographically, a child sex offender may live in relation to a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age.  720 ILCS 5/11-9.4(b-5) (West 2002).  Accordingly, we agree with the State that the essence of the defendant's argument is that he has a fundamental right to live with his mother and enjoy her support within 500 feet of a school.  We also agree with the State that no such fundamental right exists.  Accordingly, we review the defendant's claim of a violation of substantive due process under the rational-basis standard rather than under the strict-scrutiny standard urged by the defendant.  See 
People v. Stork
, 305 Ill. App. 3d 714, 720-21 (1999) ("The rational-basis test is the proper standard of review for claims of a violation of substantive due process when the statute under consideration does not affect a fundamental constitutional right").  An application of the rational-basis test involves identifying the public interest the statute is intended to protect, examining whether the statute bears a reasonable relationship to that interest, and determining whether the method used to protect or further that interest is reasonable.  
Stork
, 305 Ill. App. 3d at 721.  Furthermore, rational-basis review is highly deferential to the judgments made by the legislature.  
Village of Lake Villa v. Stokovich
, 211 Ill. 2d 106, 125 (2004).  Consequently, reviewing courts do not focus on the wisdom of the statute or whether it is the best means to achieve the desired result; rather, they will uphold the law as long as there is a conceivable basis for finding the statute rationally related to a legitimate state interest.  
Stokovich
, 211 Ill. 2d at 125-26.

Applying this test, we reach the following conclusions.  With regard to the public interest subsection (b-5) seeks to protect, we conclude that the state has a legitimate and compelling interest in protecting children from adult offenders.  See, 
e.g.
, 
People v. Williams
, 133 Ill. 2d 449, 455 (1990).  In conjunction with that interest, the state has broad powers, subject to constitutional confines, to avert potentially dangerous situations.  
Williams
, 133 Ill. 2d at 457.  As we have stated before, the prohibitive subsections of section 11-9.4 of the Criminal Code of 1961 (720 ILCS 5/11-9.4 (West 2002)) are intended to protect children from known child sex offenders.  
People v. Diestelhorst
, 344 Ill. App. 3d 1172, 1184 (2003).  Prohibiting known child sex offenders from having access to children in schools bears a reasonable relationship to protecting school children from known child sex offenders.  
People v. Stork
, 305 Ill. App. 3d 714, 722 (1999).  Accordingly, we conclude that by prohibiting child sex offenders from living within 500 feet of a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age, subsection (b-5) also bears a reasonable relationship to the goal of protecting children from known child sex offenders and sets forth a reasonable method of furthering that goal.  Although the record is bare of any statistics or research correlating residency distance with sex offenses, we conclude that it is reasonable to believe that a law that prohibits child sex offenders from living within 500 feet of a school will reduce the amount of incidental contact child sex offenders have with the children attending that school and that consequently the opportunity for the child sex offenders to commit new sex offenses against those children will be reduced as well.  Although it is not clear from the record how the distance of 500 feet was decided upon, we believe that 500 feet is a reasonable distance.  We note that among the 13 states that have enacted some form of residency restriction applicable to sex offenders, the 500-foot restriction of subsection (b-5) is the least restrictive in geographical terms.  Ala. Code §15-20-26 (Supp. 2000) (2000 feet); Ark. Code Ann. §5-14-128 (Lexis Supp. 2003) (2000 feet); Cal. Penal Code §3003(g) (Deering Supp. 2005) (certain sex offenders on parole may not live within a quarter mile from a primary school); Fla. Stat. Ann. §947.1405(7)(a)(2) (West 2001) (1000 feet); Ga. Code Ann. §42-1-13 (Supp. 2004) (1000 feet); Iowa Code Ann. §692A.2A (West 2003) (2000 feet); Ky. Rev. Stat. Ann. §17.495 (West 2003) (1000 feet); La. Rev. Stat. Ann. §14.91.1 (West 2004) (1000 feet); Ohio Rev. Code Ann. §2950.031 (Matthew Bender 2003) (1000 feet); Okla. Stat. Ann. tit. 57, §590 (West 2004) (2000 feet); Or. Rev. Stat. §§144.642, 144.643 (1999) (general prohibition on supervised sex offenders living near places where children reside); Tenn. Code Ann. §40-39-211 (Supp. 2004) (1000 feet).

The defendant's second argument on appeal is that subsection (b-5) violates procedural due process because the statute creates no means for petitioning a court for a hearing to grant an exemption and because the result of the statute is to prohibit the defendant from returning to his childhood home, which "effectively renders him homeless."  We begin by addressing the second contention of the defendant: that the statute effectively renders him homeless by prohibiting him from returning to his childhood home.  The defendant has presented no evidence to support this assertion; indeed, the factual record in this case indicates that as of May 2, 2003, the date the circuit court entered its order, the probation department had verified that the defendant was no longer living with his mother but was living instead in nearby Belleville.  Accordingly, the argument presented by the defendant is both premised on fallacious logic–for it cannot be reasonably argued in the absence of factual support that in this day and age and in this mobile society homelessness will necessarily result when one is prohibited from residing in one particular home–and  factually inaccurate.  We find this argument completely without merit.

With regard to the defendant's claim that subsection (b-5) violates procedural due process because the statute creates no means for petitioning a court for a hearing to grant an exemption, the defendant misapprehends the statute regarding this claim as well.  Presumably the defendant is referring to his desire to seek an exemption premised on the fact that he has lived in his mother's home for most, if not all, of his life, although no coherent argument to that effect is presented in the defendant's brief.  First, the plain language of the statute, quoted above, creates a built-in exemption for offenders who owned and purchased their homes prior to the provision's effective date of July 7, 2000.  720 ILCS 5/11-9.4(b-5) (West 2002).  Accordingly, it cannot be argued in good faith that the statute contains no means for receiving an exemption.  Second, with regard to seeking a hearing to request an exemption premised on how long the defendant has resided in the home in question, an individual who asserts a right to a hearing under the aegis of procedural due process must show that the facts the individual seeks to establish in that hearing are relevant under the statutory scheme.  
Connecticut Department of Public Safety v. Doe
, 538 U.S. 1, 8, 155 L. Ed. 2d 98, 105, 123 S. Ct. 1160, 1165 (2003).  This the defendant cannot do.  Subsection (b-5) turns entirely on the status of the defendant as a child sex offender.  720 ILCS 5/11-9.4(b-5) (West 2002).  The defendant's status is based on his prior conviction for a sex offense, a fact he has already had a procedurally safeguarded opportunity to contest.  Subsection (b-5) does not inquire into how long an individual previously resided in a now-prohibited home that the individual does not own; accordingly, the fact the defendant seeks a hearing to prove–that he has lived in the home, without ever owning it, most, if not all, of his life–is not at all relevant under subsection (b-5).

The defendant's third argument on appeal is that subsection (b-5) violates the defendant's right to equal protection under the law.  Specifically, the defendant contends that subsection (b-5) violates equal protection because it discriminates on the basis of the ability to own land, because under the subsection's exemption those who own their own homes are not forced to move, while those who do not own their own homes are forced to move.  The State counters that the exemption of subsection (b-5) is time-specific, not class-specific, and that accordingly it does not create a classification based on wealth and does not discriminate on the basis of an offender's ability to purchase land.  We agree with the State.  The plain language of the statute clearly states that an exemption exists for property owned by a child sex offender and purchased before the effective date of July 7, 2000.  720 ILCS 5/11-9.4(b-5) (West 2002).  The statute on its face creates a time-specific distinction, not a class-specific one.  Accordingly, the wealthiest of child sex offenders may not "buy into" the exemption, as the exemption is based on owning and purchasing the home prior to July 7, 2000; likewise, contrary to the factually inaccurate statement in the defendant's brief that "[a] person who is poor will never be able to fall within the exemption," a poor person who owned and purchased his property prior to July 7, 2000, will likewise fit squarely under the exemption.  We find this contention of the defendant completely without merit.

The defendant's fourth argument on appeal is that subsection (b-5) is a prohibited 
ex post facto 
law because it "applies to sex offenders convicted before the statute's enactment."  See U.S. Const., art. I, §§9, 10; Ill. Const. 1970, art. I, §16.  These constitutional provisions restrain Congress and the state legislatures from enacting arbitrary or vindictive legislation and ensure that statutes give fair warning of their effect.  
People v. Malchow
, 193 Ill. 2d 413, 418 (2000).  A law is 
ex post facto
 if it is both retroactive and disadvantageous to the defendant.  
Malchow
, 193 Ill. 2d at 418.  A law is disadvantageous to a defendant when that law criminalizes an act that was innocent when done, increases the punishment for a previously committed offense, or alters the rules of evidence by making a conviction easier.  
Malchow
, 193 Ill. 2d at 418.  Although not coherently developed in the defendant's brief, presumably the defendant's argument in this case is that subsection (b-5) violates the prohibition against increasing the punishment for a previously committed offense.  To determine if that is the case, we must first consider whether the restriction established by subsection (b-5) constitutes "punishment" (
Malchow
, 193 Ill. 2d at 419) and thus whether subsection (b-5) establishes criminal proceedings.  See 
Kansas v. Hendricks
, 521 U.S. 346, 361, 138 L. Ed. 2d 501, 514, 117 S. Ct. 2072, 2081-82 (1997) (noting that the principle of 
ex post facto
 applies only to criminal laws); 
Stein v. Howlett
, 52 Ill. 2d 570 (1972) (same).

When faced with the question of whether a given statute imposes a punishment, a reviewing court must first ascertain whether the legislature meant the statute to establish "civil" proceedings.  
Smith v. Doe
, 538 U.S. 84, 92, 155 L. Ed. 2d 164, 176, 123 S. Ct. 1140, 1146-47 (2003).  If the legislature intended to impose a punishment, the inquiry is complete.  
Smith
, 538 U.S. at 92, 155 L. Ed. 2d at 176, 123 S. Ct. at 1147.  If, however, the intention of the legislature was to enact a regulatory scheme that is civil and nonpunitive, the reviewing court must further examine whether the statutory scheme is so punitive in either purpose or effect that it negates the state's intention to deem it civil.  
Smith
, 538 U.S. at 92, 155 L. Ed. 2d at 176, 123 S. Ct. at 1147.  In making this determination, the reviewing court should ordinarily defer to the legislature's stated intent, and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.  
Smith
, 538 U.S. at 92, 155 L. Ed. 2d at 176, 123 S. Ct. at 1147.

As discussed above, we believe that the prohibitive subsections of section 11-9.4 of the Criminal Code of 1961 are intended to protect children from known child sex offenders.  See 
People v. Diestelhorst
, 344 Ill. App. 3d 1172, 1184 (2003).  Where a legislative restriction is an incident of the state's power to protect the health and safety of its citizens, the restriction will be considered to evidence an intent to exercise that regulatory power, and not a purpose to add to a punishment.  
Smith
, 538 U.S. at 93-94, 155 L. Ed. 2d at 177, 123 S. Ct. at 1148.  Accordingly, we conclude that the intent of the Illinois General Assembly in passing subsection (b-5) was to create a civil, nonpunitive statutory scheme to protect the public rather than to impose a punishment.

Having concluded that the intent behind the subsection was civil and not punitive, we next must consider whether the effect of the law is so punitive that it negates the state's attempt to craft civil restrictions.  
Smith
, 538 U.S. at 92, 155 L. Ed. 2d at 176, 123 S. Ct. at 1147.  Whether a punitive effect results despite a statute's nonpunitive purpose is generally evaluated by employing the seven-factor test first enunciated in the 1963 United States Supreme Court decision of 
Kennedy v. Mendoza-Martinez
, 372 U.S. 144, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963).  
Smith
, 538 U.S. at 97, 155 L. Ed. 2d at 179, 123 S. Ct. at 1149.  More recent precedent indicates that where, as here, the enactment in question applies only to past conduct that was, and still is, criminal, the following five of the seven factors are the most relevant: (1) whether the restriction has historically been regarded as a punishment, (2) whether the restriction imposes an affirmative disability or restraint, (3) whether the restriction promotes the traditional aims of punishment, namely retribution and deterrence, (4) whether the restriction has a rational connection to a nonpunitive purpose, and (5) whether the restriction is excessive with respect to this purpose.  
Smith
, 538 U.S. at 97, 155 L. Ed. 2d at 180, 123 S. Ct. at 1149.  Although these factors are neither exhaustive nor dispositive, they are " 'useful guideposts' " (
Smith
, 538 U.S. at 97, 155 L. Ed. 2d at 179-80, 123 S. Ct. at 1149 (quoting 
Hudson v. United States
, 522 U.S. 93, 99, 139 L. Ed. 2d 450, 459, 118 S. Ct. 488, 493 (1997))), and we shall employ them in our analysis of subsection (b-5).

With regard to the first factor–whether the restriction has historically been regarded as a punishment–the defendant contends that "[t]he effect of permanently preventing [the defendant] from living in the only home he has had for thirty-six years is banishment," which, in turn, has historically been regarded as a punishment.  We do not agree that the defendant in this case has been banished.  In colonial times, the most serious offenders within a community were banished, after which they could neither return to their original community nor, reputations tarnished, be admitted easily into new communities.  
Smith
, 538 U.S. at 98, 155 L. Ed. 2d at 180, 123 S. Ct. at 1150.  The record in this case is completely devoid of evidence that the defendant cannot return to his original community of East St. Louis or that he cannot be admitted easily into a new community.  Indeed, as discussed above, the record indicates that as of May 2, 2003, the date the circuit court entered its order in this case, the probation department had verified that the defendant was no longer living with his mother but was living instead in nearby Belleville.  There is absolutely no evidence that the defendant has been unable to assimilate himself into this new community or that, did he so desire, he would be unable to procure appropriate housing in his hometown of East St. Louis.  This absence of evidence is in stark contrast to the factual context before the court in 
Doe v. Miller
, 298 F. Supp. 2d 844 (S.D. Iowa 2004), wherein the court concluded that the practical effect of Iowa's 2000-foot residency restriction was to completely ban sex offenders from living in a number of Iowa's smaller towns and cities and to relegate sex offenders in the state's major communities to living in industrial areas, in some of the cities' most expensive developments, or on the very outskirts of town, where available housing was limited.  We have before us no such evidence on the practical effect of subsection (b-5) in St. Clair County or for that matter anywhere else in Illinois.  Furthermore, although the defendant is prohibited from "residing" at the home his mother owns in East St. Louis because that home is located within 500 feet of a school, he is not precluded from visiting his mother at that home on a daily basis and thereby enjoying her support.  Put simply, the restrictions placed on the defendant by subsection (b-5) in no way resemble the historical punishment of banishment, and only a tortured reading of the term banishment could lead us to conclude otherwise.  On the record before us, we cannot conclude that the restrictions of subsection (b-5) are a historic form of punishment.

We turn now to the second factor–whether the restriction imposes an affirmative disability or restraint.  To determine this, a reviewing court must consider how the effects of the statute in question are felt by those subject to it.  
Smith
, 538 U.S. at 99-100, 155 L. Ed. 2d at 181, 123 S. Ct. at 1151.  If the disability or restraint is minor and indirect, its effects are unlikely to be punitive.  
Smith
, 538 U.S. at 100, 155 L. Ed. 2d at 181, 123 S. Ct. at 1151.  Although subsection (b-5) does specifically restrict persons subject to it from living in certain areas, it does not otherwise restrict the movement and activities of such persons.  See 
People v. Malchow
, 193 Ill. 2d 413, 421 (2000).  Likewise, we are mindful that restricting the freedom of those deemed dangerous "is a legitimate nonpunitive governmental objective and has been historically so regarded."  
Kansas v. Hendricks
, 521 U.S. 346, 363, 138 L. Ed. 2d 501, 516, 117 S. Ct. 2072, 2083 (1997).  Accordingly, although we would not characterize the disability or restraint imposed by subsection (b-5) as minor or indirect, we are not convinced that the presence of this factor alone is sufficient to create a punitive effect from subsection (b-5)'s nonpunitive purpose.

With regard to the third factor–whether the restriction promotes the traditional aims of punishment, namely, retribution and deterrence–we begin our analysis with the retribution factor.  As discussed above, the purpose of the prohibitive subsections of section 11-9.4 is to protect children from known child sex offenders.  
People v. Diestelhorst
, 344 Ill. App. 3d 1172, 1184 (2003).  Also as discussed above, subsection (b-5) bears a reasonable relationship to the purpose of protecting children from known child sex offenders and sets forth a reasonable method of furthering that purpose.  There is no evidence that the subsection is designed as a form of retribution, nor does the defendant argue that it is.  We reject the idea that subsection (b-5) promotes the traditional retribution aim of punishment.  As to the deterrence factor, we noted above that it is reasonable to believe that a law that prohibits child sex offenders from living within 500 feet of a school will reduce the amount of incidental contact child sex offenders have with the children attending that school and that consequently the opportunity for the child sex offenders to commit new sex offenses against those children will be reduced as well.  Accordingly, it is possible that the subsection might deter future crimes.  However, even an obvious deterrent purpose does not necessarily make a law punitive.  
Department of Revenue of Montana v. Kurth Ranch
, 511 U.S. 767, 780, 128 L. Ed. 2d 767, 779, 114 S. Ct. 1937, 1946 (1994).  In fact, any number of governmental programs might deter crime without imposing punishment.  We agree with the United States Supreme Court that to hold that the mere presence of a deterrent purpose renders a statute criminal would severely undermine the government's ability to engage in effective regulation.  See 
Smith
, 538 U.S. at 102, 155 L. Ed. 2d at 183, 123 S. Ct. at 1152.  We reject the idea that subsection (b-5) promotes the traditional deterrence aim of punishment.  We conclude that the subsection's purpose is the protection of the public and that it does not significantly promote either retribution or deterrence.

As to the fourth factor–whether the restriction has a rational connection to a nonpunitive purpose–we have repeatedly noted that the purpose of subsection (b-5) is to protect children from known child sex offenders.  Given this purpose, it is reasonable to conclude that restricting child sex offenders from residing within 500 feet of a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age might also protect society.

As to the fifth and final factor–whether the restriction is excessive with respect to its purpose–we conclude that it is not.  As noted above, among the 13 states that have enacted some form of residency restriction applicable to sex offenders, the 500-foot restriction of subsection (b-5) is the least restrictive in geographical terms.  Likewise, as noted above, although the law restricts residency to some extent, it does not otherwise restrict the movement and activities of child sex offenders.  As the United States Supreme Court has noted, the excessiveness inquiry of 
ex post facto
 jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy.  
Smith
, 538 U.S. at 105, 155 L. Ed. 2d at 185, 123 S. Ct. at 1154.  The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective.  
Smith
, 538 U.S. at 105, 155 L. Ed. 2d at 185, 123 S. Ct. at 1154.  Having concluded that prohibiting child sex offenders from living within 500 feet of a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age bears a reasonable relationship to the purpose of protecting children from known child sex offenders and sets forth a reasonable method of furthering that purpose, we decline to now find subsection (b-5) excessive with respect to that purpose.

Our review of the effect of subsection (b-5) under the 
Mendoza-Martinez
 factors convinces us that subsection (b-5) is not so punitive that it negates the state's attempt to craft civil restrictions.  Accordingly, subsection (b-5) does not constitute an 
ex post facto
 law, and the defendant's fourth argument on appeal fails.

The defendant's fifth argument on appeal is that subsection (b-5) violates the defendant's right against self-incrimination.  Specifically, the defendant argues that because he was required to register as a sex offender and reveal his address pursuant to section 3 of the Sex Offender Registration Act (730 ILCS 150/3 (West 2002)), he was forced to incriminate himself with respect to subsection (b-5).  We begin by noting that the defendant's argument is not with subsection (b-5), which contains no registration requirements, but with section 3, which contains the registration requirement to which the defendant objects (730 ILCS 150/3 (West 2002)).  We note as well that points not argued by a party are waived and "shall not be raised in the reply brief, in oral argument, or on petition for rehearing."  188 Ill. 2d R. 341(e)(7).  Those points notwithstanding, we find, after giving due consideration to the defendant's argument, that subsection (b-5) does not violate the defendant's right against self-incrimination.

The United States Supreme Court has found various statutory registration schemes directed at specific criminal offenses to violate the fifth amendment's privilege against self-incrimination.  However, in all those cases the disclosures condemned by the Court were only those extracted from a " 'highly selective group inherently suspect of criminal activities' ", and the privilege was applied only in " 'an area permeated with criminal statutes,' " not in an essentially noncriminal and regulatory area of inquiry.  
California v. Byers
, 402 U.S. 424, 430, 29 L. Ed. 2d 9, 18, 91 S. Ct. 1535, 1539 (1971) (quoting 
Albertson v. Subversive Activities Control Board
, 382 U.S. 70, 79, 15 L. Ed. 2d 165, 172, 86 S. Ct. 194, 199 (1965)).  The Court noted that in the cases where the privilege applied, compliance with the statutory disclosure requirements would confront the individual so complying with substantial hazards of self-incrimination.  
Byers
, 402 U.S. at 430, 29 L. Ed. 2d at 18, 91 S. Ct. at 1539.  For example, in one of the cases in question, involving noncompliance with federal gambling tax and registration requirements, the Court noted that its ruling had rested on the reality that at that time almost everything connected with gambling was illegal under comprehensive state and federal statutory schemes and that, accordingly, "in almost every conceivable situation compliance with the statutory gambling requirements would have been incriminating."  
Byers
, 402 U.S. at 430, 29 L. Ed. 2d at 19, 91 S. Ct. at 1539.  Largely because of these pervasive criminal prohibitions, gamblers were considered by the Court to be a " 'highly selective group inherently suspect of criminal activities.' "  
Byers
, 402 U.S. at 430, 29 L. Ed. 2d at 18, 91 S. Ct. at 1539 (quoting 
Albertson
, 382 U.S. at 79, 15 L. Ed. 2d at 172, 86 S. Ct. at 199).  Although at first blush convicted child sex offenders might appear also to be a highly selective group inherently suspect of criminal activities, that is not the case in terms of either the application or the effect of subsection (b-5).  The residency prohibitions and the concomitant exemption of subsection (b-5) apply to all convicted child sex offenders, not just those in violation of the subsection.  For the majority of these individuals, compliance with section 3 of the Sex Offender Registration Act 
vis-a-vis
 subsection (b-5) is a matter of routine and does not implicate illegal activity.  Accordingly, this is not a case where compliance with the statutory disclosure requirements will in most cases confront the individual so complying with "substantial hazards of self-incrimination."  Although the disclosure of inherently illegal activity is inherently risky and thus is protected by the privilege against self-incrimination, the disclosures required by section 3 do not implicate inherently illegal activity and so do not generate the same risks.  Furthermore, section 3 is a part of a nonpunitive statutory scheme, the purpose of which is not to garner information for future criminal prosecutions but to provide "an additional measure of protection for children from the increasing incidence of sexual assault and child abuse."  
People v. Malchow
, 193 Ill. 2d 413, 420 (2000).  Accordingly, for purposes of a fifth amendment analysis under 
Byers
 and its progeny, the registration requirement of section 3 exists within an essentially noncriminal and regulatory area of inquiry rather than "an area permeated with criminal statutes."  To determine whether a statute violates the privilege against self-incrimination, the issue must be resolved by balancing the public need for protection against the individual claim to constitutional protection.  
California v. Byers
, 402 U.S. 424, 427, 29 L. Ed. 2d 9, 17, 91 S. Ct. 1535, 1538 (1971).  We are mindful as well that "[i]t is well[-]settled that the government need not make the exercise of the Fifth Amendment cost[-]free."  
McKune v. Lile
, 536 U.S. 24, 41, 153 L. Ed. 2d 47, 62, 122 S. Ct. 2017, 2029 (2002).  For the reasons discussed above, we conclude that a careful balancing of the purpose of section 3 of the Sex Offender Registration Act against the claim that the privilege against self-incrimination should exempt an offender who is violating subsection (b-5) from having to provide the offender's address favors the public interest involved and weighs against extending the privilege against self-incrimination.  For that reason, the defendant's fifth argument fails.

The defendant's sixth argument on appeal is that subsection (b-5) constitutes cruel and unusual punishment.  Specifically, the defendant, reiterating an earlier argument, argues that subsection (b-5) "amounts to banishment from the family home."  Having earlier in this opinion rejected the argument that the defendant in this case has been banished, and having noted that the record in this case is completely devoid of evidence that the defendant cannot return to his original community of East St. Louis or that he cannot be admitted easily into a new community, we find no merit to the defendant's argument that his alleged "banishment" by subsection (b-5) constitutes cruel and unusual punishment.

The defendant's seventh and final argument on appeal is that subsection (b-5) is overly broad "because it applies to individuals without regard to individual circumstances or exceptions."  The defendant acknowledges that overbreadth analysis is confined to alleged denials of first amendment rights, but he argues that subsection (b-5) impinges upon his right to freely assemble because the subsection prohibits him from living with his family.  We do not agree.  First, as discussed above, the subsection does not prohibit the defendant from living with his family.  The plain language of subsection (b-5), quoted above, demonstrates that the statute does not dictate with whom a child sex offender may live; to the contrary, it merely restricts where, geographically, a child sex offender may live in relation to a playground or a facility providing programs or services exclusively directed toward persons under 18 years of age.  720 ILCS 5/11-9.4(b-5) (West 2002).  Second, although the subsection does restrict residency to some extent, the defendant is in no way precluded from visiting his mother at her home on a daily basis and thereby enjoying her support and company.  Third, even assuming, 
arguendo
, that subsection (b-5) does somehow infringe upon the defendant's freedom to lawfully assemble, where a first amendment right is an "integral" part of the conduct prohibited by a statute, the right is not constitutionally protected for purposes of the overbreadth doctrine.  
People v. Jamesson
, 329 Ill. App. 3d 446, 453 (2002).  Accordingly, we reject the defendant's contention that subsection (b-5) is overly broad.

For the foregoing reasons, we affirm the order of the circuit court.

Affirmed.

HOPKINS, J., concurs.

JUSTICE KUEHN, dissenting:

Patrick Leroy became a child sex offender in 1987, when the State of Illinois convicted him of criminal sexual assault.  We are not told of the circumstances surrounding that offense, and the challenged law at issue here does not really care about any of the details that underlie a given child sex offender's crime.  We only know that Leroy had to spend more than six years of his life confined with other state prisoners in order to satisfy the punishment imposed for having committed his crime.

As things have turned out, serving a term of imprisonment fell short of expiating Patrick Leroy's misconduct.  Leroy must now suffer another restraint upon his personal liberty, an added consequence attendant to his aged criminal conviction.  On July 7, 2000, 13 years after Leroy broke the law, the Illinois legislature enacted Public Act 91-911 (Public Act 91-911 or the Act) (adding 720 ILCS 5/11-9.4(b-5) (West 2000)), a law that imposed a 500-foot residency restriction around playgrounds, schools, daycare centers, and the like and applied that ban retroactively to any child sex offender living at a residence in which he or she had no ownership interest.  Thus, the family home where Patrick Leroy had been raised from birth, a home titled in his mother's name alone, suddenly became forbidden ground, a place where Leroy could no longer live without committing a felony offense.  

The State of Illinois expelled Patrick Leroy from his home of 36 years.  Since the expulsion is without time limitation, the ouster potentially constitutes a lifetime ban from the Leroy family home.  As long as children attend the Miles Davis Elementary School, or as long as the playground that adjoins the school exists, no one who has ever been convicted of any offense that carries the mark of sexually offending against a child can live where Patrick Leroy once lived.        

It took some time for the authorities to order Leroy out of his house.  When they finally got around to seeking compliance with Public Act 91-911, almost 18 years had passed since Leroy had engaged in the criminal conduct that branded him a child sex offender.  In May of 2003, Leroy bid farewell to his mother, and to the Leroy family home that he and she had shared for 36 years.    

Leroy now lives by himself in a home located in Belleville, Illinois.     

My colleagues do not believe that what has happened to Patrick Leroy offends any of the fundamental freedoms guaranteed as this nation's birthright.  I believe that this law offends the constitutional prohibition against the enactment of 
ex post facto 
laws.  In addition, I find nothing rational about the residency restriction's relationship to the state's legitimate interest in protecting children from child sex offenders.  Therefore, I believe that it offends this individual's constitutional promise of due process of law.  For the reasons that follow, I respectfully dissent. 

The legislative intent behind Public Act 91-911 is beyond question.  Legislators wanted to find a way to better protect children from people capable of taking sexual advantage of them.  This desire resulted in Public Act 91-911, which removed 
some known
 child sex offenders from their homes, if they were located too close to playgrounds, schools, daycare centers, and any other facilities devoted exclusively to providing services to children or teenagers.  For reasons unrelated to their legislative design, legislators permitted known child sex offenders who were purchasing their homes to continue living in close proximity to places where children gather. 

   In addition, our lawmakers passed Public Act 91-911 in order to create a barrier that would prohibit all future child sex offenders from living too close to these kinds of places.   Thus, it constitutes a felony offense for future child sex offenders, and for any past child sex offender not home-buying at the time Public Act 91-911 went into effect, to live anywhere within 500 feet of numerous places where children commonly assemble.

Public Act 91-911 was not passed for the purpose of further punishing convicted child sex offenders.  However, a punitive effect unquestionably flows from this enactment.  The retroactive application of the Act's residency restriction to people like Patrick Leroy, who have no ownership interest in their homes, violates our constitutional guarantee against the imposition of 
ex post facto 
punishment.   

The first factor in weighing the potential punitive effect of an otherwise regulatory act is whether it resembles a historical form, or traditional means, of punishment.  My colleagues scoff at the notion that Public Act 91-911 creates a restriction comparable to banishment, a punishment inflicted in colonial times.  I believe that a banishment clearly resembles an expulsion of someone from his lifelong residence. 

The majority takes this position:

"We do not agree that the defendant in this case has been banished.  In colonial times, the most serious offenders within a community were banished, after which they could neither return to their original community nor, reputations tarnished, be admitted easily into new communities.  
Smith
, 538 U.S. at 98, 155 L. Ed. 2d at 180, 123 S. Ct. at 1150.  The record in this case is completely devoid of evidence that the defendant cannot return to his original community of East St. Louis or that he cannot be admitted easily into a new community.  Indeed, *** the probation department had verified that the defendant was no longer living with his mother but was living instead in nearby Belleville.  There is absolutely no evidence that the defendant has been unable to assimilate himself into this new community or that, did he so desire, he would be unable to procure appropriate housing in his hometown of East St. Louis. ***  Put simply, the restrictions placed on the defendant by subsection (b-5) in no way resemble the historical punishment of banishment, and only a tortured reading of the term banishment could lead us to conclude otherwise."  Slip op. at 10-11.

It is correct that the defendant has not been banished.  Public Act 91-911 does not call for the banishment of child sex offenders.  If it did, our inquiry would already be over.  The Act would clearly impose added punishment in violation of the constitutional ban against
 ex post facto 
penalties.    

Public Act 91-911 only created a retroactive residency restriction that, in its application to certain known child sex offenders, resembles banishment.  The majority's conclusion to the contrary stems, at least in part, from a misunderstanding of what constitutes that traditional means of punishment. 

A person is banished when he or she is expelled from a community and forbidden to return.  Banishment has nothing to do with tarnishing reputations or making it difficult for someone to assimilate into new communities, as the majority opinion suggests.  The majority defines banishment with a sentence from 
Smith v. Doe 
that it takes out of context.  The sentence concludes a lengthy discussion of a collection of punishments imposed in earlier times, and the conclusion refers to the effect that other lesser punishments had, when applied in tandem with the banishment of the most serious offenders.  The discussion leading up to the sentence that forms the majority's definition of banishment clarifies the mistake:

"Some colonial punishments indeed were meant to inflict public disgrace.  Humiliated offenders were required 'to stand in public with signs cataloguing their offenses.'  [Citations.]  At times the labeling would be permanent: A murderer might be branded with an 'M,' and a thief with a 'T.'  [Citations.]  The aim was to make these offenders suffer 'permanent stigmas, which 
in effect cast 
the person out of the community.'  [Citations.]  
The most serious offenders were banished
, after which they could neither return to their original community nor, reputation tarnished, be admitted easily into a new one."  (Emphasis added.)  
Smith v. Doe
, 538 U.S. 84, 97-98, 155 L. Ed. 2d 164, 180, 123 S. Ct. 1140, 1150 (2003).

The reference to tarnished reputations that prevent a person's easy admission into new communities after having been banished was not an intended consequence of banishment, but it was the overall consequence of being banished, after first being publicly disgraced by other traditional means of punishment.  

Thus, the analysis of whether Public Act 91-911 resembles the historical punishment of banishment should be confined to whether its restriction is similar to the permanent expulsion of someone from the community in which he or she lives.

The majority rejects the similarity between the Act's retroactive residency restriction and banishment, by finding that the record "is completely devoid of evidence that the defendant cannot return to his original community of East St. Louis."  Slip op. at 10.  The majority further finds that there "is absolutely no evidence that the defendant *** would be unable to procure appropriate housing in his hometown of East St. Louis."  Slip op. at 10.   I again agree that Patrick Leroy has not been banished from East St. Louis.  

In looking for evidence that Leroy has been banished, my colleagues are looking for the wrong thing.  The inquiry should question whether the retroactive application of the residency restriction contained in Public Act 91-911 resembles banishment, rather than ask whether the restriction in fact banishes Leroy from his hometown.   

It could be very difficult for Patrick Leroy to find comparable housing within the city limits of East St. Louis, Illinois, without offending the commands of Public Act 91-911.  Notwithstanding, our examination of whether the retroactive application of this Act's residency restriction is similar to the colonial punishment of banishment should not focus upon whether Leroy can, or cannot, find somewhere else to live in East St. Louis.  

When we understand what constitutes banishment and we consider the essence of its punitive aim, we find at its core the permanent expulsion of a criminal offender from his or her home.  When a colonial offender was banished, he was ordered to leave his desired living space and was barred for life from ever returning to it.  The underlying penal effect was the permanent loss of companionship and home of choice. 

We do not have to torture the English language in order to conclude that what happened to Patrick Leroy resembles how people used to be punished in colonial times.  Our inquiry into whether the retroactive residency restriction imposed by this law violates constitutional 
ex post facto 
constraints should progress from a finding that the restriction imposed resembles a historical form, and a traditional means, of punishment.  We should find that criminalizing Patrick Leroy's long-standing home of choice, and imposing an indeterminate ban upon his ever living there again, constitutes an eviction very much akin to a banishment imposed in earlier times.  To indefinitely expel a man from his family home, and separate him from family members with whom he has lived his entire life, seems decidedly similar to a method of punishment employed in colonial times.  The only significant difference between a colonial banishment of some unwanted offender and the Act's retroactive expulsion of Patrick Leroy from where he wanted to live is how this reinvented form of permanent exclusion from home and family violates the constitutional protection against 
ex post facto 
punishment.  As far as I know, our colonial ancestors would not have contemplated the banishment of people from their midst almost 18 years after they offended some colonial law.       

If my colleagues feel that the restriction must completely force Leroy out of his hometown in order to resemble banishment, they might consider the unique circumstances surrounding his hometown, circumstances forged by a post-World War II economic boom, followed by the past four decades of relentless urban decay.  While Leroy failed to provide evidence about this circumstance, we are not required to blind ourselves to events that, as a matter of common knowledge, we know to exist.

The historical evolution of East St. Louis has resulted in a present-day community that possesses a plethora of schools and playgrounds.  At the same time, there is a paucity of decent housing.   

The schools and playgrounds are by-products of an economic expansion that East St. Louis experienced immediately after the second world war.  Countless factories and manufacturing plants provided employment that grew East St. Louis into a workingman's town.     

Middle-class housing, in tightly packed neighborhoods, provided homes where East St. Louis workers could raise a family.  As the adult population topped 80,000 people, the child population exploded.  The baby boom, during which most couples procreated threefold, swept into East St. Louis in the mid-1950s.  The Eisenhower years presented a time when a lot of East St. Louis children were in need of a lot of schools.  Public and private schools, with adjoining asphalt playgrounds, were built throughout the crowded East St. Louis neighborhoods.  

The decade of the sixties brought the beginning of a great sea-change that would eventually alter the East St. Louis landscape.  Over the years that ensued, the manufacturing and production plants would disappear, along with the families that once populated the town's crowded neighborhoods.  Nicely maintained middle-class homes became slums, which were condemned and torn down.  What was once decent housing became weed-ridden vacant lots.  Today, remaining homes like the one Leroy was ordered to leave tend to cluster around areas where schools still operate.  

There are still a large number of public and private schools in operation, despite the fact that East St. Louis has close to two-thirds fewer inhabitants.  A lot of the schools that no longer operate because of this phenomenon still stand, along with their asphalt playgrounds, into which swing sets, jungle gyms, and basketball hoops are implanted. 

East St. Louis still has 25 schools in operation.  A number of former school buildings still stand, despite their closure.  Their adjoining playgrounds render the surrounding neighborhoods off-limits to the likes of Patrick Leroy.  In addition, all the Catholic schools that still operate, or that still stand with playgrounds intact, create large residential zones forbidden to Patrick Leroy.  

There are also teen centers, daycare facilities, and other publicly funded facilities dedicated to the betterment of the minority youth of East St. Louis, and these facilities add to that part of East St. Louis in which Patrick Leroy is forbidden to live. 

My colleagues take solace in the fact that Leroy found housing in Belleville.  Leroy's ability to find a nonoffending place in which to live within the town of Belleville has nothing to do with the inquiry, although it is curious that Leroy abandoned his hometown of 36 years and took up residence in another place.  Even if I believed that my colleagues' approach to this inquiry was appropriate, I would still conclude, because of the unique history of Leroy's hometown, a history that results in Leroy being banned from living in such a large percentage of available housing, that the Act's residency restriction is akin to the historical punishment of banishment, as applied to Patrick Leroy.

My colleagues observe the obvious–that Public Act 91-911 imposes an affirmative disability and restraint of more-than-minor consequence.  However, they give this factor only passing attention, dismissing it with the comment, "[A]lthough we would not characterize the disability or restraint imposed by subsection (b-5) as minor or indirect, we are not convinced that the presence of this factor alone is sufficient to create a punitive effect from subsection (b-5)'s nonpunitive purpose."  Slip op. at 11.

I am completely at odds with the majority about this factor.  I would reach an exactly opposite conclusion.  I believe that this 
one factor alone
 creates the kind of punitive effect that should bar the retroactive application of the residency restriction imposed by Public Act 91-911.

The majority's cursory deflection of the disability imposed by the retroactive application of the residency restriction contained in Public Act 91-911 unduly minimizes how significant and offensive its restraint really is to non-home-buying past offenders.  Prohibiting someone from living where he has lived his entire life imposes a substantial disability.  Our legislature recognized as much, allowing known child molesters who were in the process of purchasing their homes to remain in them, regardless of how close the home was to a school, playground, or daycare center and regardless of how recent or reprehensible the home-buying child molester's conduct was.  

Our history has always placed great emphasis upon, and given great deference to, the place where an American chooses to live.  The inalienable rights that compose our most cherished values are inextricably tied to an American's ability to settle, and to live, in a place of his or her choosing.  

Privacy interests protected by the fourth amendment are more stringently guarded when a person's home is at issue.  And no governmental unit or agency, including the State of Illinois, can constitutionally take a person's home from that person, unless the property is needed for a public use and full compensation is paid.  U.S. Const., amend. V.  The Constitution's protection of private property from governmental intrusion and usurpation is no doubt responsible for our legislature's decision to allow home-buying child molesters to live near playgrounds, schools, and daycare centers while, at the same time, deciding to expel all other known child sex offenders from their homes.  The legislature could not apply the residency restriction retroactively to known child sex offenders who could assert that such an application constituted a state-taking of property without public purpose or just compensation.    

  The majority is far too lightly concerned about the disability and restraint imposed by the retroactive application of this Act's residency restriction to non-home-buying offenders who committed their crimes in the distant past.    

The restriction's retroactive application does not simply prohibit Patrick Leroy from living in certain areas around this state.  Unlike the many child sex offenders who are purchasing their homes, the residency restriction's imposition effectively 
removes 
Patrick Leroy from his home.  The restriction casts him from his lifelong residence.  The permanent expulsion of Leroy from a home in which he has lived his entire life, and the forced separation from his only family member, an aging mother who could use his ever-present care and companionship, is extremely punitive in its effect, particularly in light of the fact that Leroy has not committed another sex offense for more than 18 years and the fact that there is no evidence to suggest that he is apt to reoffend in the future.  In my view, the retroactive disability and restraint imposed by this Act is very comparable to a restraint upon physical freedom, like imprisonment, for the punitive effect directly infringes upon traditionally guarded freedoms and otherwise protected personal liberties.  The majority fails to see how the residency restriction promotes traditional aims of punishment–deterrence and retribution.  I disagree with this myopia. 

While my colleagues readily observe how the Act's residency restriction might deter future crimes, they recast the inquiry from a discussion of whether the restriction at issue promotes deterrence, a traditional aim of punishment, to a discussion of how all regulatory schemes can carry a deterrent effect and how those regulations are not necessarily punitive in nature because of that fact.  By focusing upon the assertion that all regulatory schemes that impose restrictions could be said to carry a deterrent effect, my colleagues skirt the issue, discounting the residency restriction's ability to promote deterrence, a traditional aim of punishment, just like they dismissed the question of whether this Act's restriction imposes the kind of disability and restraint that carries a punitive effect.  In truth, this restriction provides deterrence every bit as effectively as other forms of punishment, a circumstance that no one even questions.  The restriction clearly promotes a traditional aim of punishment.  

The second common aim of punishment is retribution.  We are told, "There is no evidence that [the residency restriction contained in Public Act 91-911] is designed as a form of retribution ***."  Slip op. at 12.  Again, the majority avoids any analysis of the real question posed, by misdirection.  Our inquiry should not ask whether the legislature 
designed 
the residency restriction to exact retribution but should rather question whether the residency restriction's 
application 
tends to promote or advance retribution, a common aim of punishment.   

While I am quite certain that legislators did not design the residency restriction contained in Public Act 91-911 to exact retribution, and thereby correct for wrongdoing, in which case the enactment would be 
designed to punish 
and therefore clearly violate the constitutional ban against 
ex post facto 
punishments, I believe that the restriction's application tends to promote retribution, a traditional aim of punishment.  

 Public Act 91-911 imposes a blanket residency restriction based upon only one criterion–conviction of the kind of criminal offense that marks the offender a "child sex offender."  It does not discriminate based upon whether or not a particular individual actually presents some danger to children.  The age of the conviction, the age of the offender, the nature of the crime, and the choice of the victim do not matter.  

 While there are numerous examples of how this Act's residency restriction advances a retributive purpose that commonly underlies the imposition of punishment, we need only look to Patrick Leroy's circumstance in order to understand how the Act's restriction tends to advance retribution, a traditional aim of punishment.  The restriction casts Leroy out of his house because of an 18-year-old conviction, the details of which are unimportant to the expulsion's imposition.  Without a better understanding of the nature of his offense, particularly his choice of victim, we cannot assess Leroy's likelihood for recidivism.  Since we neither know nor care whether Leroy's removal from his home advances the safety of children attending Miles Davis Elementary School, we need to acknowledge that the automatic eviction, at least to a degree, promotes retribution for wrongdoing.  

We might well ask ourselves two questions.  What reason exists, in the absence of retribution, to expel Leroy from living in the Leroy family home when, as the majority points out, the prohibition does not preclude his daily unconstrained visitations there?  Absent a tendency to promote retribution, what legitimate purpose would legislators have in removing Patrick Leroy from his home, given the fact that he has lived there for 10 years without reoffending, despite his close proximity to the hundreds upon hundreds of children who have matriculated to Miles Davis Elementary School during the same time span?   

A restriction imposed without consideration for the likelihood of a particular offender to reoffend has to be grounded, at least in part, in furtherance of retribution.  Here, the restriction is imposed without regard to the particulars of the offense, including the offender's choice of victim.  The nature of the crime and the choice of the victim constitute important considerations in predicting what a prior offender's proximity to a given child-laden facility could mean in terms of reoffending.  For example, a man branded a child sex offender for having had consensual sex with a 17-year-old girl could safely reside in close proximity to toddlers gathered at a daycare center but present a problem living across the street from a high school.  On the other hand, a pedophile grandfather, branded a child sex offender for fondling his young grandchildren and their friends, presents a potential problem living across the street from a daycare center but could safely reside in close proximity to a high school. Since this Act treats all offenders alike, without consideration of whether a particular offender is likely to reoffend, its retroactive residency restriction promotes and furthers retribution, a traditional aim of punishment. 

Finally, the residency restriction attaches without time limitation, expelling Patrick Leroy from his home and excluding his return forever, without regard for the likelihood of public danger.  The retroactive application of the Act's residency restriction exceeds that which is necessary to protect children and enters the realm of retribution.

Although Public Act 91-911 has a purpose other than the simple punishment of child sex offenders, a serious question arises regarding whether the legislation rationally serves its alternative purpose of protecting children from child molesters.  This part of my analysis relates to my reasons for thinking that due process has been violated, as well as one of my reasons for believing that Public Act 91-911 has a punitive effect that constitutionally prohibits retroactive application.  

If what we seek is to better protect children from child sex offenders, how do we possibly accomplish that aim by imposing a 500-foot residency restriction around schools, playgrounds, daycare centers, and the like?  When we consider what the legislature is trying to accomplish by banning certain past child sex offenders, and all future child sex offenders, from living in certain zones, close in proximity to facilities that deal exclusively with children, we must necessarily question what goal a 500-foot residency restriction hopes to attain.  

State statutes that impose 2000-foot residency restrictions bear at least some reasonableness in their relationship to the interest that the legislation hopes to serve.  Those restrictions place children out of sight and mind, beyond senses that could stir the perversions of known child sex offenders.  At least arguably, a 2000-foot restriction reduces opportunity, diminishes temptation, and thereby decreases the risk that a proven child sex offender will reoffend.  

Illinois child sex offenders can reside close enough to playgrounds, schools, and daycare centers to tempt their inner desires and promote their ability to reoffend.  A 500-foot residency restriction inhibits nothing.  Child sex offenders can live just outside the restricted area, gaze out their kitchen window, and covet the children that they see playing on a school playground some 500 feet away.  

The restriction does not prevent child sex offenders from either seeing or communicating with children.  It does not remove opportunity and temptation, the rationale that attempts to provide constitutional support for this kind of law.  Any Illinois child sex offender can easily sit on his front porch with a cheap pair of binoculars and 
closely 
eye the features of any child that he chooses.  Indeed, he can watch a target of his sexual fancy from just the right distance not to find notice, and his watchful eye can still rest beyond any area where his kind are prohibited from living.  Any Illinois child sex offender can still call out to children, lure them to the house, engage in sexual exposure, or do all manner of things that child sex offenders do, with all the ease that befalls a child molester who moves into closer range with the aid of a car.  As long as child sex offenders can live around 500 feet from where children gather, they can still look at and crave the objects of their sexual desire.  When they can still see children, and can still be heard by children, child sex offenders can still lust after children and take all the steps needed to reoffend against them. 

The innocent children of this state, frolicking upon playgrounds, within eyeshot of some child sex offender, remain every bit the temptation that they present to child sex offenders at large, regardless of where those offenders live.  Simply put, the statutory restriction is pointless.  The restriction bears no rational relationship to a legitimate state interest.  It is a mindless effort that does nothing to prevent any child sex offender intent on reoffending from doing so.  The restriction does not remove temptation or opportunity, for the restriction does not remove child sex offenders from either earshot or eyeshot of children.   Whatever prompted our legislature to arrive at a 500-foot barrier is unknown.  Perhaps cases like 
Doe v. Miller
, 298 F. Supp. 2d 844 (S.D. Iowa 2004), that have struck down 2000-foot residency restrictions played into the decision to reduce the scope of the ban.  Whatever it was, the result is a statutory prohibition that bears no rational relationship to the interest that it seeks to serve.  Children going to school are no safer with a safety net that bans child sex offenders from living 500 feet from their school than they were before that legislation was passed.  The opportunity and temptation remain around the schools and playgrounds of this state.  

The word "rational" connotes insight and logic.  This legislation constitutes a totally blind imposition of disability and restraint.  A man who was convicted 18 years ago of an offense that brands him a child sex offender, who had consensual sex with a 17-year-old underage teen and who has not reoffended since, must relocate, if not purchasing his home, even if that home rests 499 feet from an infant daycare center.  But a recently released child molester, with a lengthy history of molesting very young children, and a diagnosed pedophile to boot, can live in any house he chooses, so long as it rests at least 501 feet from a place attended on a daily basis by infant children, the prime targets of his known sexual propensities.  Moreover, that same individual can move back into a house next door to a child daycare center provided that he was purchasing the house prior to the Act's effective date.  

I fail to understand how the restriction imposed by Public Act 91-911 bears any rational relationship to the protection of children from people capable of taking sexual advantage of them.  I suspect that Patrick Leroy, after 18 years without committing another child sex offense, is no longer one of those people.  Hopefully he is not, for his expulsion from the house in which he used to live, a home located just a short distance from Miles Davis Elementary School, will not protect the school's students from him, if he is intent upon reoffending.  As previously noted, Patrick Leroy can return "on a daily basis" to the home from which he has been removed.  I would assume that on any given visit, he could do the kind of things our legislators feared that he might otherwise do, if he lived there.  As my colleagues observe, Leroy has the right to be precisely where legislators did not want him to be, every morning when the children of Miles Davis Elementary School arrive, and every afternoon when the same children leave.  Since school is a daytime event, Leroy has essentially all the access that he had before the State of Illinois, for no rational reason, banned him from the place where he wanted to live.     

Public Act 91-911, viewed in light of the 
Kennedy v. Mendoza-Martinez
, 372 U.S. 144, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963), factors, exceeds its legislative intent to craft a civil regulatory scheme for the protection of children and is, in all truth, punitive in nature.  It cannot be applied to Patrick Leroy, whose conviction predates the imposition of its disability and restraint by 13 years, without violating the constitutional guarantee against 
ex post facto
 punishment.  And because the restriction bears no rational relationship to the legitimate state interest it was intended to serve, because it in no way furthers the safety of children from known child sex offenders, the restriction violates Leroy's right to due process of law.

For these reasons, I respectfully dissent.

                                      NO. 5-03-0333

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee,
 )  St. Clair County.

)

v. )  No. 01-CF-1118

)

PATRICK LEROY, )  Honorable

)  Robert J. Hillebrand,

     Defendant-Appellant. )  Judge, presiding.

___________________________________________________________________________________

Opinion Filed
: April 12, 2005

___________________________________________________________________________________

Justices
: Honorable Thomas M. Welch, J.

Honorable Terrence J. Hopkins, J.

Concurs   

Honorable Clyde L. Kuehn, J.

Dissents

___________________________________________________________________________________

Attorneys
 Daniel M. Kirwan, Deputy Defender, Rita K. Peterson, Assistant Defender, Office

for
 of the State Appellate Defender, Fifth Judicial District, 730 E. Illinois Highway 15,

Appellant
 Suite #1, Mt. Vernon, IL 62864

___________________________________________________________________________________

Attorneys
 Hon. Robert Haida, State's Attorney, St. Clair County, 10 Public Square, Belleville,

for
 IL 62220; Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Trent

Appellee
 M. Marshall, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor,

730 E. Illinois Highway 15, P.O. Box 2249, Mt. Vernon, IL 62864

___________________________________________________________________________________

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 04/12/05.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.