RENDERED: OCTOBER 1, 2009
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2007-SC-000347-CL

DATE 11-2-200~ *Kelly Klaber* D.C.

COMMONWEALTH OF KENTUCKY                                     PETITIONER


FROM KENTON DISTRICT COURT
V.                 HONORABLE MARTIN J. SHEEHAN, JUDGE
NO. 07-M-00604


MICHAEL BAKER                                               RESPONDENT


**OPINION OF THE COURT**

**CERTIFYING THE LAW**


## I. INTRODUCTION

The question of law to be answered is whether KRS 17.545, which restricts where registered sex offenders may live, may be applied to those who committed their offenses prior to July 12, 2006, the effective date of the statute. We hold that it may not. Even though the General Assembly did not intend the statute to be punitive, the residency restrictions are so punitive in effect as to negate any intention to deem them civil. Therefore, the retroactive application of KRS 17.545 is an ex post facto punishment, which violates Article I, Section 10 of the United States Constitution, and Section 19(1) of the Kentucky Constitution.

## II. BACKGROUND

### A.  Kentucky's Sex Offender Residency Restrictions

On July 29, 1994, seven-year-old Megan Kanka disappeared from her neighborhood in Hamilton Township, New Jersey. Soon after, police discovered that Megan had been raped and murdered by a man previously convicted of sex offenses. New Jersey enacted what became known as "Megan's Law," requiring sex offenders to register with the state, and establishing notification procedures for those living nearby. The same year, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offenders Registration Act, which conditioned certain law enforcement funding on states enacting their own version of Megan's Law.

Like every other state, Kentucky has enacted a version of Megan's Law. The General Assembly first enacted sex offender registration requirements in 1994, amending them in 1996 and again in 2000. The 2000 amendments to our Megan's Law also included residency restrictions on sex offenders as a condition of their probation or parole. That restriction, codified at KRS 17.495, read as follows:

> No registrant, as defined in KRS 17.500, who is placed on probation, parole, or other form of supervised release, shall reside within one thousand (1,000) feet of a high school, middle school, elementary school, preschool, or licensed day care facility. The measurement shall be taken in a straight line from the nearest wall of the school to the nearest wall of the registrant's place of residence.

This Court upheld the registration provisions of Kentucky's Megan's Law in Hyatt v. Commonwealth, 72 S.W.3d 566 (Ky. 2002). The next year, the

2

United States Supreme Court upheld Alaska's sex offender registration statute against an ex post facto challenge in Smith v. Doe, 538 U.S. 84 (2003).[1]

In 2006, the General Assembly enacted House Bill 3, which amended Kentucky's residency restrictions to their current form. 2006 Ky. Acts 182. The current residency restriction statute, effective July 12, 2006, codified at KRS 17.545, reads as follows:

> (1) No registrant, as defined in KRS 17.500, shall reside within one thousand (1,000) feet of a high school, middle school, elementary school, preschool, publicly owned playground, or licensed day care facility. The measurement shall be taken in a straight line from the nearest property line of the school to the nearest property line of the registrant's place of residence.
>
> (2) For purposes of this section:
>
> (a) The registrant shall have the duty to ascertain whether any property listed in subsection (1) of this section is within one thousand (1,000) feet of the registrant's residence; and
>
> (b) If a new facility opens, the registrant shall be presumed to know and, within ninety (90) days, shall comply with this section.
>
> (3) Any person who violates subsection (1) of this section shall be guilty of:
>
> (a) A Class A misdemeanor for a first offense; and
>
> (b) A Class D felony for the second and each subsequent offense.
>
> (4) Any registrant residing within one thousand (1,000) feet of a high school, middle school,

---

[1] Doe subsequently challenged the registration statute in state court on state law grounds, with the Alaska Supreme Court holding that the statute cannot be applied retroactively. Doe v. State, 189 P.3d 999 (Alaska 2008).

elementary school, preschool, publicly owned playground, or licensed day care facility on July 12, 2006, shall move and comply with this section within ninety (90) days of July 12, 2006, and thereafter, shall be subject to the penalties set forth under subsection (3) of this section.

(5) This section shall not apply to a youthful offender probated or paroled during his or her minority or while enrolled in an elementary or secondary education program.

While the original residency restriction statute applied only to those on probation, parole, or other form of supervised release, the current statute applies to all registrants regardless of probation or parole status. In addition, KRS 17.545 adds publicly owned playgrounds to the list of prohibited areas, and measures the distance from the property line as opposed to the wall of a building. The statute also places the burden on the registrant to determine whether he is in compliance. Violation of the residency restriction is a Class A misdemeanor for the first offense, and a Class D felony for subsequent offenses.

## B. Procedural History

On March 31, 1995, Respondent Michael Baker entered a guilty plea to a charge of third-degree rape in Kenton Circuit Court. In addition to Respondent's probated sentence of five years imprisonment, pursuant to the version of KRS 17.520 in effect at the time, Respondent was required to register as a sex offender until March 27, 2010.

Respondent subsequently lived in Reading, Ohio with his family. However, the City of Reading's sex offender residency restrictions forced

4

Respondent to move back to Kentucky. On February 2, 2007, Respondent resided in Elsmere, Kentucky and was arrested and charged with violating KRS 17.545 for living within 1,000 feet of East Covered Bridge Park, allegedly a public playground.

According to Respondent, the Division of Probation and Parole provided him with a link to a website to determine whether he was in compliance with KRS 17.545. The website did not show East Covered Bridge Park and the surrounding area to be a prohibited zone.

In Kenton District Court, Respondent challenged KRS 17.545 on a number of constitutional grounds and moved to dismiss the charges against him. On April 20, 2007, the Kenton District Court granted Respondent's motion and dismissed the charges.

The district court concluded that KRS 17.545, as applied to Respondent, violated the ex post facto clauses of the United States and Kentucky Constitutions. In its thorough opinion, the district court found that the General Assembly had intended KRS 17.545 to be punitive. The district court also found that, even if KRS 17.545 were not clearly punitive, its effect was punitive. Upon finding the statute to be unconstitutional as applied to Respondent, the district court declined to address the remaining constitutional challenges.

The Commonwealth then moved this Court for certification of law to determine whether KRS 17.545 is an ex post facto punishment. See Ky. Const.

5

§ 115, CR 76.37(10). We granted certification to resolve this important constitutional issue.[2]

## III. ANALYSIS

The United States Constitution and the Kentucky Constitution, through their respective ex post facto clauses,[3] prohibit the enactment of any law that imposes or increases the punishment for criminal acts committed prior to the law's enactment. The Ex Post Facto Clause of the United States Constitution "forbids . . . the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" Weaver v. Graham, 450 U.S. 24, 28 (1981) (quoting Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325-26 (1867)).

As a threshold question, for a law to be considered ex post facto, "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Hyatt, 72 S.W.3d at 571

---

[2] The Indiana Supreme Court recently held that, as applied to those who committed their crimes before the statute was enacted, Indiana's sex offender residency restriction statute constitutes retroactive punishment forbidden by the ex post facto clause of the state's constitution. State v. Pollard, 908 N.E.2d 1145 (Ind. 2009).

See also Mikaloff v. Walsh, No. 5:06-CV-96, 2007 WL 2572268 (N.D. Ohio Sept. 4, 2007) (holding that retroactive application of Ohio's residency restriction statute violates the federal Ex Post Facto Clause). The Mikaloff appeal was dismissed at the State's request, presumably because the Ohio Supreme Court subsequently prohibited retroactive application of the residency restriction statute on grounds that the Ohio legislature had not expressly made the law retroactive. See Hyle v. Porter, 882 N.E.2d 899 (Ohio 2008).

But see, e.g., Doe v. Miller, 405 F.3d 700 (8th Cir. 2005); State v. Seering, 701 N.W.2d 655 (Iowa 2005); Thompson v. State, 603 S.E.2d 233 (Ga. 2004); People v. Leroy, 828 N.E.2d 769 (Ill. App. Ct. 2005); Lee v. State, 895 So. 2d 1038 (Ala. Crim. App. 2004) (all upholding residency restriction statutes against ex post facto challenges).

[3] U.S. CONST. Art. 1, § 10; KY. CONST. § 19(1).

(quoting Weaver, 450 U.S. at 29). There is no question that KRS 17.545 applies to conduct by Respondent that occurred well before the law's enactment. In addition, Respondent is disadvantaged by the law, as it restricts where he may live. However, to violate the ex post facto clause, the statute must also be punitive. Martin v. Chandler, 122 S.W.3d 540, 547 (Ky. 2003) (citing California Dept. of Corr. v. Morales, 514 U.S. 499, 506 n.3 (1995)).

In determining whether, with regard to those like Respondent, KRS 17.545 constitutes retroactive punishment forbidden by the ex post facto clauses, we are guided by the United States Supreme Court's two-part test from Smith v. Doe, 538 U.S. 84 (2003). First, we must determine whether the legislature intended to establish a civil, nonpunitive, regulatory scheme, or whether the legislature intended to impose punishment. Id. at 92 (citing Kansas v. Hendricks, 521 U.S. 346, 361 (1997)). If the legislature intended to impose punishment, our inquiry ends. Smith, 538 U.S. at 92. If, however, the legislature intended to enact a civil, nonpunitive, regulatory scheme, then we must determine "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.' " Id. (quoting Hendricks, 521 U.S. at 361) (internal quotations and citations omitted).

## A.    Whether the General Assembly Intended KRS 17.545 to be Punitive

We must first determine whether the General Assembly intended to establish a civil, nonpunitive, regulatory scheme, or whether the legislature intended to impose punishment. In determining the legislature's intent, this Court "must first ask whether the legislature, in establishing the penalizing

7

mechanism, indicated either expressly or impliedly a preference for one label or the other." Smith, 538 U.S. at 93 (quoting Hudson v. United States, 522 U.S. 93, 99 (1997)). Therefore, we look to the General Assembly's expressed and implied intent. In determining the General Assembly's implied intent, we look to, as discussed in Smith, "[o]ther formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes." 538 U.S. at 94.

We begin by examining the General Assembly's expressed intent in enacting KRS 17.545. The legislative history of House Bill 3 is extremely sparse. The bill was entitled "AN ACT related to sex offenses and the punishment thereof." 2006 Ky. Acts 182. This title suggests that the General Assembly intended KRS 17.545 to be punitive. However, while the title of an act may be used as an aid in statutory construction, Wheeler & Clevenger Oil Co., Inc. v. Washburn, 127 S.W.3d 609, 613 (Ky. 2004), we do not believe that it should be determinative in this situation.

We therefore look to the General Assembly's implied intent in enacting KRS 17.545. First, we consider the manner of its codification. Kentucky's original sex offender residency restrictions, which were codified at KRS 17.495, were part of the 2000 amendments to Kentucky's Megan's Law.[4] 2000 Ky. Acts 401. In Hyatt v. Commonwealth, this Court, addressing the sex offender registration portions of our Megan's Law (including the 2000 amendments),

---

[4] KRS Chapter 17 is entitled "Public Safety."

concluded that those statutes "are directly related to the nonpunitive goals of protecting the safety of the public." 72 S.W.3d at 572.

Second, we look at the penalties established by KRS 17.545. Violation of residency restrictions is a crime: a Class A misdemeanor for the first offense and a class D felony for subsequent offenses. KRS 17.545(3). However, criminal liability attaches only if the offender fails to move. This is similar to the criminal liability under KRS 17.510(11) for failing to register as a sex offender, which we upheld in Hyatt, 72 S.W.3d at 573. See also Smith, 538 U.S. at 101-02 ("A sex offender who fails to comply with the reporting requirement may be subjected to a criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense.").

We conclude that the General Assembly intended KRS 17.545 to be a civil, nonpunitive, regulatory scheme. Therefore, we now consider the second part of the Smith test.

**B.    Whether KRS 17.545 is Punitive in Purpose or Effect**

Because we conclude that the General Assembly did not intend KRS 17.545 to be punitive, we must now determine "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.' " Smith, 538 U.S. at 92 (quoting Hendricks, 521 U.S. at 361) (internal quotations and citations omitted). In making such a determination, courts are guided by seven factors originally discussed in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963). Smith, 538 U.S. at 97.

9

As in Smith, the five factors relevant here are, "whether, in its necessary operation, the regulatory scheme" (1) has been regarded in our history and traditions as punishment, (2) promotes the traditional aims of punishment, (3) imposes an affirmative disability or restraint, (4) has a rational connection to a nonpunitive purpose, or (5) is excessive with respect to the nonpunitive purpose. Id.

### 1.    Historically Regarded as Punishment

We first address whether the scheme established by KRS 17.545 has been regarded in our history and traditions as punishment. Traditionally, the colonial era practice of banishing an offender from the community has been regarded as a form of punishment. Smith, 538 U.S. at 98. Banishment has been defined as "punishment inflicted upon criminals by compelling them to quit a city, place, or country, for a specified period of time, or for life." United States v. Ju Toy, 198 U.S. 253, 269-70 (1905).

As the district court noted, courts reviewing sex offender residency restrictions have avoided or sidestepped the issue of whether these restrictions constitute banishment, and "dissenting judges have been far more intellectually honest concluding that residency restrictions constitute banishment." While KRS 17.545 is not identical to traditional banishment,[5] it does prevent the registrant from residing in large areas of the community. It also expels registrants from their own homes, even if their residency predated

---

[5] It is, of course, not identical to traditional banishment, because the registrant may still return to the house during the day, when children are present, so long as he does not make the house his permanent home.

10

the statute or arrival of the school, daycare, or playground. Such restrictions strike this Court as decidedly similar to banishment. We therefore conclude that the residency restrictions in KRS 17.545 have been regarded in our history and traditions as punishment.

## 2.  Promotion of the Traditional Aims of Punishment

Next, we address whether KRS 17.545 promotes the traditional aims of punishment: retribution and deterrence. Mendoza-Martinez, 372 U.S. at 168. KRS 17.545 promotes general deterrence through the threat of negative consequences, i.e. eviction or restriction of where a person may live in the future. More significant, however, is the statute's retributive effect.

KRS 17.545 makes no individualized determination of the dangerousness of a particular registrant. Even those registrants whose victims were adults are prohibited from living near an area where children gather. When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones. In his concurring opinion in Smith, Justice Souter expressed his unease with the absence of individualized risk assessment:

> Ensuring public safety is, of course, a fundamental regulatory goal . . . and this objective should be given serious weight in the analyses. But, at the same time, it would be naïve to look no further, given pervasive attitudes toward sex offenders . . . . The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose

11

> no real threat to the community, serves to feed
> suspicion that something more than regulation of
> safety is going on; when a legislature uses prior
> convictions to impose burdens that outpace the law's
> stated civil aims, there is room for serious argument
> that the ulterior purpose is to revisit past crimes, not
> prevent future ones.

Smith, 538 U.S. at 108-09 (Souter, J., concurring). By imposing restraints based solely upon prior offenses, KRS 17.545 promotes and furthers retribution against sex offenders for their past crimes. We therefore conclude that KRS 17.545 promotes the traditional aims of punishment.

### 3. Affirmative Disability or Restraint

Next, we address whether KRS 17.545 imposes an affirmative disability or restraint. We find it difficult to imagine that being prohibited from residing within certain areas does not qualify as an affirmative disability or restraint. In Hyatt, this Court upheld registration requirements, noting that registration does "not place limitations on the activities of the offender . . . ." 72 S.W.3d at 572 (citing Collie v. State, 710 So. 2d 1000 (Fla. Ct. App. 1998)). In Smith, the U.S. Supreme Court found it significant that "offenders subject to the Alaska [registration] statute are free to move where they wish and to live and work as other citizens, with no supervision." 538 U.S. at 101.

By contrast, KRS 17.545 places significant limitations on where a registrant may live. With this limitation come significant collateral consequences. As the district court noted, the restrictions could, for example, "impact where an offender's children attend school, access to public transportation for employment purposes, access to employment opportunities,

12

access to drug and alcohol rehabilitation programs and even access to medical care and residential nursing home facilities for the aging offender."

The registrant also faces a constant threat of eviction "because there is no way for him or her to find a permanent home in that there are no guarantees a school or [other facility] . . . will not open within 1,000 feet of any given location." State v. Pollard, 908 N.E.2d 1145 at 1150 (Ind. 2009). As such, a registrant cannot establish a permanent home. KRS 17.545 clearly imposes affirmative disabilities and restraints upon registrants.

## 4.    Rational Connection to a Nonpunitive Purpose

We next consider whether KRS 17.545 has a rational connection to a legitimate nonpunitive public purpose. The Commonwealth argues that residency restrictions serve the nonpunitive purpose of public safety, which is undoubtedly a legitimate purpose. The question is therefore whether KRS 17.545 bears a rational connection to public safety.

KRS 17.545 prohibits registrants from residing (i.e. sleeping at night, when children are not present) within 1,000 feet of areas where children congregate, but it does not prohibit registrants from spending all day at a school, daycare center, or playground (when children are present). It allows registered sex offenders to sit across the street and watch children, and even to work near children. KRS 17.545 does not even restrict an offender from living with the victim, so long as they live and sleep outside of the prohibited area. All KRS 17.545 prohibits is residing in a home within the prohibited zone. It does not regulate contact with children. It is difficult to see how public safety

is enhanced by a registrant not being allowed to sleep near a school at night, when children are not present, but being allowed to stay there during the day, when children are present.[6]

KRS 17.545 is connected to public safety. However, the statute's inherent flaws prevent that connection from being "rational." Therefore, we conclude that KRS 17.545 does not have a rational connection to a nonpunitive purpose.

### 5. Excessive with Respect to a Nonpunitive Purpose

Finally, we address whether KRS 17.545 is excessive with respect to the nonpunitive purpose of public safety. In making that determination, we note the lack of individualized risk assessment, combined with the statute's fluidity.

First, as noted previously, KRS 17.545 does not make any type of individualized assessment as to whether a particular offender is a threat to public safety. KRS 17.545 prohibits all registrants—regardless of whether the registrant's victim was an adult, teenager, or child, and regardless of whether the crime was violent, nonviolent, or statutory—from living within 1,000 feet of a school, playground, or daycare facility. There is absolutely no individual determination.

The Commonwealth correctly points out that a "statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." Smith, 538 U.S. at 103. In Smith, the U.S. Supreme

---

[6] These same questions were raised by the dissent in People v. Leroy, 828 N.E. 2d 769, 793 (Ill. App. Ct.) (Kuehn, J., dissenting).

14

Court concluded that individual assessment was not necessary for sex offender registration requirements, and that "[t]he State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause." Id. at 104.

In Kansas v. Hendricks, the U.S. Supreme Court upheld involuntary civil commitment of sex offenders who had completed their period of incarceration. 521 U.S. 346. The Kansas law at issue required individual assessment of offenders prior to commitment. Id. at 352-53. The Smith court noted that, while individual assessment is not required for sex offender registration, in Hendricks, "[t]he magnitude of the restraint made individual assessment appropriate." Smith, 538 U.S. at 104.

The residency restrictions found in KRS 17.545 are more onerous than the registration requirements at issue in Hyatt and Smith, but less onerous than the involuntary commitment in Hendricks. We believe that the "magnitude of the restraint" involved in residency restrictions is sufficient for a lack of individual assessment to render the statute punitive.

The record before us does not reveal whether or not Respondent might be a threat to children and to public safety. But this is exactly why KRS 17.545 is excessive.[7] Given the drastic consequences of Kentucky's residency restrictions, and the fact that there is no individual determination of the threat

---

[7] See Pollard, 908 N.E.2d at 1153 ("Restricting the residence of offenders based on conduct that may have nothing to do with crimes against children, and without considering whether a particular offender is a danger to the general public, the statute exceeds its non-punitive purposes.").

15

a particular registrant poses to public safety, we can only conclude that KRS 17.545 is excessive with respect to the nonpunitive purpose of public safety.

Second, as the district court stated, "[t]he excessiveness of Kentucky's residency restrictions is further heightened by their fluidity." While a sex offender may be permitted one day to live in a particular home, he may the next day find himself prohibited by the opening of a school, daycare facility, or playground. Perhaps even more troublesome is the fact that a city could easily designate an area a playground, and the statute provides no guidance as to what exactly qualifies as a "playground."

While such fluidity may provide little problem for registrants in rural areas of Kentucky, it should be easy to see why this becomes a serious burden in areas such as Louisville, Lexington, or Respondent's home of Northern Kentucky, with its dozens of tightly clustered municipalities. Furthermore, the statute places the sole burden on the registrant in determining whether or not he is in compliance. KRS 17.545(2). This fluidity and uncertainty makes KRS 17.545 excessive with respect to the purpose of public safety.

Of the five Smith factors, all five weigh in favor of concluding that KRS 17.545 is punitive in effect. Therefore, we conclude that KRS 17.545 is so punitive in effect as to negate the General Assembly's intention to deem it civil.

## IV. CONCLUSION

Although the General Assembly did not intend KRS 17.545 to be punitive, the residency restrictions are so punitive in effect as to negate any intention to deem them civil. Therefore, the statute may not constitutionally be

applied to those like Respondent, who committed their crimes prior to July 12, 2006, the effective date of the statute. To do so violates the ex post facto clauses of the United States and Kentucky constitutions. The law is so certified.

Cunningham, Noble, Schroder, Scott, and Venters, JJ., concur. Abramson, J., dissents by separate opinion in which Minton, C.J., joins.

ABRAMSON, JUSTICE, DISSENTING: Virtually alone among appellate courts to consider the issue, the majority has invalidated the retroactive application of legislation forbidding convicted sex offenders from residing near the schools, day care centers, and playgrounds where potential child victims congregate. In so doing the majority has, with respect to a most difficult social problem, arrogated to itself the role of legislator and has substituted its public policy judgment for that of the General Assembly. Because our democratic system leaves such policy choices to the legislature, and because I agree with the several other courts that have held that retroactive sex offender residency restrictions do not exceed legislative authority to address vital public safety concerns, I respectfully dissent.

## RELEVANT FACTS

As the majority notes, since 1994, when it adopted Kentucky's initial version of Megan's Law, the General Assembly has engaged in an evolving effort to address the profoundly serious and vexing problem of sex offenders, particularly those who offend against children. As part of this effort, Megan's Law, or the Sex Offender Registration Act, KRS 17.500 to 17.540, requires

17

convicted sex offenders and offenders against minors to register their addresses with the local probation and parole office. In 2000, the General Assembly sought further to protect potential child victims by forbidding registrants during the course of their probation or parole from residing within 1,000 feet of day care centers and elementary, middle, and high schools. In 2006, the General Assembly again expanded its protective efforts by enacting House Bill 3, the legislation at issue here, which, *inter alia*, extends the previously enacted residential restrictions. The amended restrictions, currently codified at KRS 17.545, apply to all registrants, not just to probationers and parolees, and add public playgrounds to the list of protected sites.

Michael Baker, who was convicted in 1994 of third-degree rape and so came under KRS 17.510's registration requirement, was living within 1,000 feet of a public playground in Elsmere, Kentucky, when he was notified that he was in violation of the amended residency restrictions. In February 2007 he was charged in Kenton District Court with a class A misdemeanor. Baker challenged KRS 17.545 as violative of the federal and state *Ex Post Facto* Clauses, constitutional provisions that forbid the state from either punishing or increasing punishment retroactively. By Order entered April 20, 2007, the district court agreed with Baker and declared the statute's retroactive application invalid. Pursuant to Section 115 of our Constitution and CR 76.37(10), the Commonwealth then moved this Court for a certification of law on the following issue: "Whether KRS 17.545 was enacted with the intent to

18

punish sex offenders or is so consequentially excessive as to negate any inferred contrary intent to regulate sex offender recidivism."

## ANALYSIS

Resolution of this case, as the majority notes, requires consideration of the two-part test the United States Supreme Court has applied to *ex post facto* issues in such cases as Kansas v. Hendricks, 521 U.S. 346 (1997) (upholding the retroactive application of a Kansas statute providing for the civil commitment of dangerous sex offenders) and Smith v. Doe, 538 U.S. 84 (2003) (upholding the retroactive application of Alaska's version of the Sex Offender Registration Act). Under that test, a statute may be deemed punitive, and thus subject to the *Ex Post Facto* Clause's prohibition against retroactive punishment, if the legislature evidenced a punitive intent, or, even where the legislature intended a civil, non-punitive, regulatory statute, if "the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'" Smith, 538 U.S. at 92 (citations and internal quotation marks omitted). Because courts generally defer to legislative intent, however, "*only the clearest proof will suffice* to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92 (emphasis supplied, citations and internal quotation marks omitted). The transformation the majority has worked in this case is contrary to this deferential standard.

## I. The General Assembly Intended KRS 17.545 To Be Civil Rather Than Punitive.

The majority correctly concedes that the General Assembly intended KRS 17.545's residence restrictions to serve a regulatory, non-punitive, public safety function. Indeed, the residence restrictions have been codified in the "Public Safety" Chapter of the Kentucky Revised Statutes, Chapter 17, immediately following the Sex Offender Registration Act, an Act held to be non-punitive and thus not subject to the *Ex Post Facto* Clause, in Hyatt v. Commonwealth, 72 S.W.3d 566 (Ky. 2002). Nevertheless, the majority concludes that KRS 17.545's residence restrictions are so punitive in effect as to belie the General Assembly's apparently regulatory intent and to render KRS 17.545 inapplicable to the many registered sex offenders whose crimes were committed prior to the statute's effective date of July 12, 2006. This ruling obviously deals a severe blow to the statute's effectiveness and reflects, in my judgment, this Court's failure to give due deference to the General Assembly's contrary intent.

## II. The Effect of KRS 17.545 Is Not So Punitive As To Negate the General Assembly's Intention.

As the majority correctly notes, in assessing the punitive effect of legislation intended to be merely regulatory, the United States Supreme Court has considered the following factors: "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive

purpose; or is excessive with respect to this purpose." Smith, 538 U.S. at 97.

Several appellate courts have addressed the retroactive application of sex offender residency restrictions in light of these factors, and all but one of them have held that the restrictions, some far more severe than Kentucky's 1,000 foot buffer zone, were primarily regulatory, not punitive, and thus did not implicate *ex post facto* limitations. Doe v. Miller, 405 F.3d 700 (8th Cir. 2005) (Iowa's 2,000 foot buffer zone regulatory, not punitive); State v. Seering, 701 N.W.2d 655 (Iowa 2005) (upholding 2,000 foot buffer zone); Salter v. State, 971 So. 2d 31 (Ala. App. 2007) (approving 2,000 foot buffer zone); People v. LeRoy, 828 N.E.2d 769 (Ill. App. 2005) (approving 500 foot buffer zone). *See also* Standley v. Town of Woodfin, 650 S.E.2d 618 (N.C. App. 2007) (upholding ban on entering public park); Doe v. Baker, 2006 WL 905368 (N.D. Ga. 2006) (upholding 1,000 foot buffer zone). *See generally* Marjorie A. Shields, "Validity of Statutes Imposing Residency Restrictions on Registered Sex Offenders," 25 ALR 6th 227 (2007). *But see* State v. Pollard, 908 N.E.2d 1145 (Ind. 2009) (residence restriction deemed punitive in large part because it applies without a particularized assessment of dangerousness). As these courts have noted, residence restrictions are not a traditional form of punishment and their punitive effects are not undue in light of their important public safety objective. In my view, the majority's application of the Supreme Court's factors fails at several points to defer, as we are obliged to do, to permissible legislative judgments, and amounts thus to judicial legislating under the guise of constitutional analysis.

21

## A. Residence Restrictions Are Not, and Do Not Resemble, Traditional Forms of Punishment.

Contrary to the majority's assertion, for example, KRS 17.545's residence restriction does not resemble banishment in either purpose or effect. Banishment, of course, was a means of removing dangerous individuals from the community in days when prisons did not exist or were inadequate to serve that purpose. KRS 17.545, by contrast, leaves registered sex and child offenders completely free to live, work, and participate in the community. It seeks only to lessen the contact, and hence the opportunity for tragedy, between known sex offenders and some of the community's most vulnerable members. The statute's potential requirement that a registered sex offender change residence is not unlike a zoning change with a like effect, a far cry from banishment or any other traditional form of punishment.

In other cases it has been argued that the buffer zones around protected sites left little or no residential opportunities available to registrants, and thus did tend to force registrants outside the community. We have not been referred to any similar showing in the record before us, however, and the buffer zones under Kentucky's statute are smaller than those at issue in most of those other cases. Even in those cases, the courts have held that because the residence restrictions left registrants free to visit, work, and otherwise conduct their affairs throughout the community, they did not resemble banishment in any but a superficial sense. *See, e.g.* Doe v. Miller, supra. The record here

suggests only that Baker has been inconvenienced by being forced to move.[8] The majority's claims notwithstanding, he has not been banished.

## B. Although KRS 17.545 Imposes A Burden, That Burden Is Not Retributive.

Baker has been burdened, however. There is no doubt but that residence restrictions are a form of disability. That fact alone, however, does not render KRS 17.545 punitive. The vast majority of civil regulatory statutes impose some sort of disability or restraint. The questions, rather, are whether the disability here serves punitive ends and whether it is so excessive with regard to the civil ends it is meant to serve as not to be rational. The majority maintains that KRS 17.545 is both punitive and irrational.

It is punitive, the majority contends, because it applies only to convicted sex offenders. Because the regulation is based on a prior offense, the majority concludes that it amounts to additional retribution for that offense. As the United States Court of Appeals for the Eighth Circuit in Doe v. Miller explained, however, residence restrictions single out prior offenders not because their past conduct is to be further punished, but because that conduct is an indicator of future dangerousness, which the legislature hopes to mitigate. The regulation looks not to the past crime, but to the danger of future recidivism.

The majority contends that that forward looking focus is belied by the fact that the regulation does not attempt to distinguish the more from the less

---

[8] Baker's counsel notes that he moved to Kentucky shortly before the charges were filed when residency restrictions in Reading, Ohio, prohibited him from residing in his former residence there.

23

dangerous offenders, but the record before us provides no basis for that distinction. As the United States Supreme Court noted six years ago in <u>Smith v. Doe</u>, there is data suggesting that "[t]he risk of recidivism posed by sex offenders is 'frightening and high.'" 538 U.S. at 103. It may well be, of course, that as more data is gathered important differences among different types of offenders will emerge, differences which could have a bearing on legislative choices. That, however, is precisely the sort of information law makers, not courts, are designed to assess. There is nothing in the record before us which would preclude the General Assembly from treating sex offenders as a class, or would compel it to make the distinctions the majority favors. Neither Baker nor the majority, in sum, has shown that KRS 17.545 is a retributive statute, and most assuredly they have not shown retribution by the "clearest proof."

## C. KRS 17.545 Reasonably Advances A Vital Public Safety Aim.

The final questions, then, are whether KRS 17.545 rationally serves a valid non-punitive purpose, and whether the disabilities it creates are excessive in light of that purpose. As our sister courts have held, residence restrictions have the vital, non-punitive purpose of protecting children from sexual assaults and other crimes. In <u>Smith</u>, <u>supra</u>, the Supreme Court noted that a statute's "rational connection to a nonpunitive purpose is a 'most significant' factor in our determination that the statute's effects are not punitive." 538 U.S. at 102 (citation omitted). The majority acknowledges, as it must, the General Assembly's legitimate, regulatory concern with public safety, but opines that KRS 17.545 is an irrational means to serve the public safety end because it

24

does not solve the recidivism problem by eliminating any and all opportunities for a sex offender to reoffend.

The majority has applied far too strict a standard. The General Assembly is not obligated to fashion perfect statutes, Cornelison v. Commonwealth, 52 S.W.3d 570 (Ky. 2001), nor is it precluded from addressing part of a problem and leaving other parts for another day. Holbrook v. Lexmark International Group, Inc., 65 S.W.3d 908 (Ky. 2001). As the United States Supreme Court stated in Smith, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." 538 U.S. at 103. As in Smith, the imprecision the majority relies upon "does not suggest that [KRS 17.545]'s nonpunitive purpose is a sham or mere pretext." *Id.* at 103 (citation and internal quotation marks omitted). On the contrary, while residential restrictions cannot eliminate all contacts between potential recidivists and their potential child victims, particularly where perpetrator and victim are related, they are clearly a rational means of decreasing those contacts, and thus the General Assembly could reasonably believe that they would enhance the overall safety of children. In denying the reasonableness of that belief, the majority disregards the General Assembly's right to address problems in part, rather than comprehensively, and improperly substitutes its policy judgment for that of the General Assembly.

## D. The Disability KRS 17.545 Imposes Is Not Excessive In Light Of Its Vital Purpose.

Under Smith, even if a regulation rationally serves a non-punitive purpose, it may still be deemed punitive if the disability or restraint it imposes

25

is excessive with respect to that purpose. The majority characterizes KRS 17.545's disability—its potential requirement that registrants move away from protected buffer zones—as "drastic," and deems that disability excessive for a couple of reasons. The disability is excessive first, according to the majority, because it applies to all registrants without an individualized assessment of future dangerousness. It is also excessive, the majority opines, because it is "fluid," *i.e.*, because the protected buffer zones can change as schools, day care centers, and playgrounds open or relocate.

As the majority acknowledges, the Supreme Court rejected the first argument in <u>Smith v. Doe</u>. Upholding the retroactive application of Alaska's Sex Offender Registration Act against that very argument, the Court explained that

> [t]he *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences. We have upheld against *ex post facto* challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment. See *De Veau*, 363 U.S. at 160 . . . *Hawker*, 170 U.S. at 197. . . . As stated in *Hawker*: "Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application. . . ." *Ibid.* The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause.

<u>Smith v. Doe</u>, 538 U.S at 103-04.

26

The majority seeks to distinguish Smith by noting that KRS 17.545 imposes a more onerous burden than the mandatory registration at issue in that case. It cites Kansas v. Hendricks, supra, in which the Supreme Court upheld the retroactive application of a Kansas statute providing for the civil commitment of dangerous sex offenders. That statute passed constitutional muster, the Court explained, in part because the statutory scheme included individualized assessments of dangerousness. The majority asserts that the residence restrictions at issue here are more like civil commitment than mandatory registration, and that without individualized assessments of dangerousness those restrictions are excessive.

The flaw here is that residence restrictions are even less like civil commitment than they are like banishment. Registrants are not being confined against their wills, they are merely being told not to reside in certain areas and at worst to move from where they already reside. The majority characterizes this imposition as "drastic," but in fact, having to move, whether as a result of eviction, foreclosure, eminent domain, or zoning change, is a common legal consequence and does not serve to render the underlying laws punitive. Far from being involuntarily confined, Baker has at most been significantly inconvenienced, and, in light of the fact that convicted sex offenders are more likely to offend against children than the general population, our sister courts have found this inconvenience not such as to remove residence restrictions such as KRS 17.545 from the legislature's authority to "legislate with respect to

27

convicted sex offenders as a class." Smith, 538 U.S. at 104. Doe v. Miller, supra.

The majority also finds the regulatory effect of KRS 17.545 excessive because the restricted areas can change as protected sites come and go. We have not been referred to anything in the record, however, suggesting that protected sites change with undue frequency or that Baker has been subjected to such changes. Absent that record, the majority's speculation on this point amounts again to nothing but its usurpation of the General Assembly's public policy prerogative.

## CONCLUSION

In sum, I strongly disagree with the majority's conclusion that KRS 17.545 is a punitive statute subject to *ex post facto* limitations. The statute does not impose a traditional punishment; it is forward looking, not retributive; it rationally serves the vital public safety function of reducing contacts between potential child victims and potential sex offense recidivists; and it does so without imposing disproportionate civil disabilities. I find the majority's strained analysis to the contrary unconvincing, and I am dismayed both by its disregard of the nearly unanimous precedent upholding the retroactive application of similar legislation in other states and by its invasion of the General Assembly's sphere of expertise and authority. Accordingly, I respectfully dissent.

Minton, C.J., joins.

COUNSEL FOR PETITIONER:

Jack Conway
Attorney General

Jason Bradley Moore
Assistant Attorney General
Office of Criminal Appeals
Attorney General's Office
1024 Capitol Center Dr.
Frankfort, KY 40601

Christopher S. Nordloh
28 West 5th St.
Covington, KY 41011

COUNSEL FOR RESPONDENT:

Bradley Wayne Fox
Fox & Scott, PLLC
517 Madison Ave.
Covington, KY 41011