OPINION OF THE COURT
Michael D. Stallman, J.
In this CPLR article 78 proceeding, petitioner Foster Williams seeks a judgment prohibiting respondent New York State Department of Corrections and Community Supervision, sued here as Department of Corrections and Community Supervision, from enforcing Executive Law § 259-c (14), which was enacted pursuant to the Sexual Assault Reform Act (SARA) (L 2000, ch 1) and subsequently amended by chapter 544 of the Laws of 2005, against petitioner, and declaring that the law is unconstitutional, insofar as the law prevents him from traveling or living within 1,000 feet of a school.[1]
Background
On January 12, 1996, after a jury trial, petitioner was convicted of one count of rape in the first degree (Penal Law *358 § 130.35 [3]), three counts of sodomy in the first degree (Penal Law § 130.50 [3]), and one count of endangering the welfare of a child (Penal Law § 260.10 [1]; see People v Williams, 257 AD2d 425, 425 [1st Dept 1999]; see also verified petition, exhibit A [sentence & order of commitment]), on the finding that petitioner forcibly raped and sodomized a nine-year-old girl. Petitioner was sentenced to an indeterminate term of imprisonment of 7 to 21 years. The maximum expiration date of petitioner’s sentence is November 18, 2016.
Penal Law § 220.00 (14) and SARA
Penal Law § 220.00 (14) defines “school grounds” as follows:
“ ‘School grounds’ means (a) in or on or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school, or (b) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicle located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an ‘area accessible to the public’ shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants” (emphasis added).
In 2000, the New York Legislature enacted the Sexual Assault Reform Act, which took effect on February 1, 2001 (L 2000, ch 1). As part of SARA, a new subdivision (14) was added to section 259-c of the Executive Law[2] (see L 2000, ch 1, § 8). As enacted, subdivision (14), in relevant part, provided:
“where a person serving a sentence for an offense defined in article one hundred thirty, one hundred thirty-five or two hundred sixty-three of the penal law or section 255.25 of the penal law and the victim of such offense was under the age of eighteen at the time of such offense, is released on parole . . . , the board [of parole] shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in paragraph (a) of subdivision fourteen of section *359 220.00 of the penal law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present” (emphasis added).[3]
In 2005, the legislature amended SARA by passing an act, entitled “SEX OFFENSES—SCHOOL BUILDINGS AND GROUNDS—CONDITIONAL RELEASE” (L 2005, ch 544). As part of the 2005 act, Executive Law § 259-c (14) was amended to read:
“where a person serving a sentence for an offense defined in article one hundred thirty, one hundred thirty-five or two hundred sixty-three of the penal law or section 255.25 of the penal law and the victim of such offense was under the age of eighteen at the time of such offense or such person has been designated a level three sex offender pursuant to subdivision six of section [168-Z] of the correction law, is released on parole or conditionally released . . . , the board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the penal law,1[4]1 or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present” (L 2005, ch 544, § 2 [emphasis added]).
The 2005 act went into effect on September 1, 2005.
*360 Petitioner’s Release to Parole
On November 12, 2012, respondent’s State Board of Parole issued a decision releasing petitioner to parole supervision (verified answer, exhibit A). On December 19, 2012, petitioner was adjudicated a level two sex offender by the Supreme Court, New York County (verified petition ¶ 4, exhibit B). It is undisputed that, on December 20, 2012, petitioner was released to parole supervision, and is scheduled to remain on parole supervision until November 18, 2016 (id. ¶ 5, exhibit C; verified answer ¶ 4).
Prior to his release, petitioner agreed to a number of conditions imposed by the Board of Parole (verified answer, exhibit B). Petitioner signed a form which, in relevant part, provided,
“I understand that I will be in the legal custody of the Division of Parole until the 18th day of November, 2016, and agree to abide by the conditions of my release with the full knowledge that failure to do so may result in my [reimprisonment] by order of the Board of Parole pursuant to law” (verified answer, exhibit B [application for conditional release to parole supervision]).
As a mandatory condition of release to parole supervision, petitioner agreed to “not knowingly enter into or upon any school grounds as that term is defined in Penal Law § 220 (14)” (verified petition, exhibit A).
As part of special conditions of release to parole supervision, petitioner agreed that, until November 18, 2016, he “will not enter, remain, or be with[in] 1,000 feet of places where children congregate, such as . . . parks, schools, day care, playgrounds . . . without the prior knowledge and permission of my Parole Officer” (verified answer, exhibit C [special conditions of release to parole supervision] ¶ 13; see also verified petition, exhibits D, E).
Prior to his incarceration, petitioner allegedly lived in New York City for over 25 years, and in Manhattan for over 20 years. Upon his release, petitioner was directed to move to the Bellevue Men’s Shelter at 400 East 30th Street, New York, New York, and he currently resides there.
On November 16, 2012, petitioner’s attorneys wrote to the Board of Parole, requesting that the 1,000-foot “residency restriction” be removed from petitioner’s parole conditions, on the ground that, among other things, the imposition of this restriction violates the Ex Post Facto Clause of the United States Constitution (art I, § 10; verified petition, exhibit F).
*361 In a letter dated December 12, 2012, respondent wrote back to petitioner’s attorneys stating that, pursuant to Executive Law § 259-c (14), “the SARA condition” applies to petitioner because he was “an offender who [was] serving a sex offense . . . and whose victim [was] under the age of 18” (verified petition, exhibit G).
Petitioner states that: (1) he is now 64 years old (verified petition ¶ 2); (2) since January 2013, he has been looking for an apartment that would comply with the condition {id. ¶ 23); (3) based on his savings and the anticipated public assistance, he is “willing to spend about $600 per month on rent” (id.)-, (4) because of his age and medical conditions,[5] he is “unable to climb many stairs or walk very far,” and his “housing search is limited to apartments without many stairs and that are [close] to a subway station” {id. ¶¶ 20-21, 24); (5) it is important for him “to find housing that [would] allow [him] to easily get to [his] doctor’s office, to [his] sex offender and drug addiction treatment programs, and to [his] appointments with [his] parole officer” at the Division of Parole (the last two places are located in Manhattan) (id. ¶¶ 17, 18, 21, 22, 24); (6) in his housing search, he received help from his friends and Morgan Buras, a social work intern at the Office of the Appellate Defender’s social work/reentry program, and has used the services of two room rental agencies (id. ¶¶ 25-27); (7) the rooms that the rental agencies have found and the six available apartments that he visited in the Bronx and Manhattan were all allegedly too close to schools {id. ¶¶ 26, 28); (8) because it is painful for him to walk, it has been difficult for him to visit different apartments in order to determine their proximity to a school or day care (id. ¶ 29); and (9) he has “been informed that nearly all residential addresses in New York County are within 1,000 feet of a school,” and that the situation is not better in other boroughs (id. ¶ 30).
Petitioner provides an affidavit of Buras, who states that: (1) she has worked with petitioner to help him secure housing; (2) “[i]t is very difficult to find housing that complies with [petitioner’s] residency restriction”; “it seems that almost all of the housing that is available is within 1,000 feet of a school or day care” {id., exhibit H [Apr. 11, 2013 Buras aff] ¶ 6); (3) if not for the residency restriction, petitioner “would be able to find *362 an apartment within his financial means” (id. ¶ 7); (4) petitioner “is very responsible” and “is doing everything he can to find permanent housing” (id. ¶ 9); and (5) it is important that petitioner finds a stable living situation; “[t]he homeless shelter system is not a long-term solution”; and “the conditions in the Bellevue Men’s Shelter are not conducive to [petitioner’s] reintegration into society, particularly given his age and health” (id. ¶ 8).
Petitioner challenges Executive Law § 259-c (14), as amended by the 2005 act, to the extent that it prohibits him from living or traveling within 1,000 feet of a school, on the grounds that it violates: (1) the United States Constitution’s ban on ex post facto lawmaking (US Const, art I, § 10), as applied to him; (2) his federal and state constitutional rights to substantive due process (US Const, 14th Amend, § 1; NY Const, art I, § 6); and (3) his constitutional right to travel.
Discussion
Form of Action
The first issue is whether this proceeding may be brought as a CPLR article 78 proceeding.
“[A]n article 78 proceeding is generally the proper vehicle to determine whether a statute, ordinance, or regulation has been applied in an unconstitutional manner” (Matter of Kovarsky v Housing & Dev. Admin, of City of N.Y., 31 NY2d 184, 191 [1972]; see also Dimiero v Livingston-Steuben-Wyoming County Bd. of Coop. Educ. Servs., 199 AD2d 875, 877 [3d Dept 1993]). However, “an article 78 proceeding may not be used to test the constitutionality of a legislative enactment, as distinct from the constitutionality of its application” (Board of Educ. of Belmont Cent. School Dist. v Gootnick, 49 NY2d 683, 687 [1980]). An action that challenges the constitutionality of a legislative act should be converted to a declaratory judgment action (see id.).
Given that petitioner here challenges both the constitutionality of a legislative act and its allegedly unconstitutional application, this proceeding, pursuant to CPLR 103 (c), is converted to a combined declaratory judgment action and CPLR article 78 proceeding (see e.g. Press v County of Monroe, 50 NY2d 695, 702 [1980]; see also Matter of Capital Fin. Corp. v Commissioner of Taxation & Fin., 218 AD2d 230, 232 [3d Dept 1996]).
Presumption of Constitutionality
“Legislative enactments enjoy a strong presumption *363 of constitutionality. While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statute’s invalidity beyond a reasonable doubt. Moreover, courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional” (LaValle v Hayden, 98 NY2d 155, 161 [2002] [internal quotation marks and citations omitted]; see also People v Foley, 94 NY2d 668, 677 [2000], cert denied 531 US 875 [2000] [“an enactment of the Legislature ... is presumed to be valid”]; People v Davis, 43 NY2d 17, 30 [1977], cert denied 438 US 914 [1978] [“(s)tate statutes under scrutiny . . . will be stricken as unconstitutional only as a last resort and . . . courts may not substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation”]; Courtesy Sandwich Shop v Port of N.Y. Auth., 12 NY2d 379, 389 [1963] [if a piece of legislation is susceptible to “two possible interpretations(,) the court will accept that which avoids constitutional doubts”]).
A. Ex Post Facto Clause Analysis
The United States Constitution, in relevant part, provides: “No State shall. . . pass any ... ex post facto Law” (US Const, art I, § 10 [1]). “One function of the Ex Post Facto Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission” (Garner v Jones, 529 US 244, 249-250 [2000]; see also Collins v Youngblood, 497 US 37, 42 [1990]). “[W]here the challenged statute does not seek to impose a punishment, it does not run afoul of the Ex Post Facto Clause” (Kellogg v Travis, 100 NY2d 407, 410 [2003]).
“[T]he constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them” (Collins, 497 US at 41). “Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of’ the Ex Post Facto Clause (Garner, 529 US at 250).
The 2005 Act
Pursuant to SARA, the Board of Parole is obligated to require that petitioner, as a mandatory condition of his release to parole supervision, “refrain from knowingly entering into or upon any school grounds” (L 2000, ch 1, § 8; see also Executive Law *364 § 259-c [14]). Pursuant to the 2005 act,[6] the legislature expanded the definition of “school grounds.” Prior to the 2005 act, “school grounds” were defined only as grounds and structures within a property line of a school (see L 2000, ch 1, § 8; Penal Law § 220.00 [14] [a]). The 2005 act expanded the definition to either grounds and structures within the property line of a school, or an area within 1,000 feet of the property line of a school (see L 2005, ch 544, § 2; Penal Law § 220.00 [14] [a]-[b]). It is undisputed that respondent, as a condition of petitioner’s release on parole, applies the latter definition (see e.g. verified answer, exhibit C [special conditions of release to parole supervision] ¶ 13).
Intent-Effects Test
“In determining whether a statute renders the punishment for a crime more burdensome for purposes of the Ex Post Facto Clause, the United States Supreme Court has implemented an intent-effects test. Under the first prong of this test, the court determines whether the legislature intended the statute to be punitive or civil in nature. If the court finds that the legislature intended the statute to be punitive, then its retroactive application violates the Ex Post Facto Clause” (People v Parilla, 109 AD3d 20, 23 [1st Dept 2013] [citation omitted]; see also Smith v Doe, 538 US 84, 92 [2003]; Kansas v Hendricks, 521 US 346, 361 [1997] [“(t)he categorization of a particular proceeding as civil or criminal is first of all a question of statutory construction” (internal quotation marks and citation omitted)]).
Legislative Intent
The New York Legislature explained that one of the reasons behind SARA was “to amend the penal law, the executive law and the correction law, in relation to prohibiting certain sex offenders placed on conditional release or parole from entering upon school grounds or other facilities where children are cared for” (L 2000, ch 1, preamble). “The proposed legislation recognizes the particularly heinous nature of sex crimes committed against children and takes important steps to protect children from sexual predators” (Mem of NY Attorney General, Aug. 22, *365 2000 at 2, Bill Jacket, L 2000, ch 1). SARA, among other things, “[increases probation terms for sex offenders and bars certain probationers and parolees from entering school grounds” (Mem of St Health Dept, Aug. 15, 2000, Bill Jacket, L 2000, ch 1 at 9).
With respect to the 2005 act, the legislature stated in the preamble: “AN ACT to amend the penal law, the executive law and the correction law, in relation to prohibiting certain sex offenders placed on conditional release or parole from entering upon school grounds or other facilities where children are cared for” (L 2005, ch 544).
The Sponsor’s Memorandum in the Senate, Bill S479-A, in relevant part provides:
“JUSTIFICATION: Chapter 1 of the Laws of 2000 [SARA] provides that persons convicted of a certain sexual offense when the victim of such offense was under the age of eighteen years shall be required to refrain from knowingly entering into or upon any school grounds, as that term is defined in paragraph (a) of subdivision fourteen of section 220.00 of the Penal Law.
“However, this legislation recognizes the fact that level three sex offenders should not be allowed on or around school grounds no matter what the age of the victim. This bill removes the under age 18 language with regard to the level three sex offenders’ victim. Therefore, this bill would provide that all level three sex offenders will not be allowed to live or enter within 1000 feet of any school grounds no matter how old the victim was at the time” (Senate Introducer Mem in Support, L 2005, ch 544 [available through NY St Leg Retrieval Serv at http ://public.leginfo. state.ny.us/menugetf. cgi]).
The Sponsor’s Memorandum in the Assembly, Bill A8894, in relevant part provides:
“PURPOSE: To prohibit sex offenders placed on conditional release or parole from entering upon school grounds or other facilities where the individual has been designated as a level three sex offender. .. .
“JUSTIFICATION: There is a need to prohibit those sex offenders who are determined to pose the most risk to children from entering upon school grounds or other areas where children are cared for” (Assembly Sponsor’s Mem, Bill Jacket, L 2005, ch 544 *366 at 4 [emphasis added]).
Following the passage of legislation, assemblyman Harvey Weisenberg, the bill’s sponsor, wrote, in relevant part, to Counsel to the Governor:
“We need to prohibit sex offenders who are determined to pose the most risk to children from entering upon school grounds or other areas where children are cared for. Given the threat to our children posed hy sex offenders and the terrible damage caused by their heinous acts, we must strive to protect the youngest and most vulnerable members of our society from such horrible crimes in any way we can” (Letter from Harvey Weisenberg, Aug. 5, 2005, Bill Jacket, L 2005, ch 544 at 3 [emphasis added]).
Counsel and Deputy Commissioner for Legal Affairs of the State Education Department wrote, in relevant part, to Counsel to the Governor:
“The State Education Department recommends approval of this bill because it will provide greater protection to children by prohibiting those sex offenders who have been determined to pose the greatest risk to children and have been released on probation, parole or conditional release from entering school grounds or other facilities or institutions where children are cared for or treated. Where the probationer or parolee has a legitimate need for access to the school or facility, as a student or as the parent of a student, allowing access upon written authorization assures that school officials are on notice that the probationer or parolee may be present, so that a balance can be struck between the rights of the parolee or probationer and the need to protect other children in the school or facility ” (Mem of St Educ Dept, July 8, 2005, Bill Jacket, L 2005, ch 544 at 6-7 [emphases added]).
Accordingly, the legislature sought to protect children from harm and not to increase punishment against sex offenders. Although the legislature uses the language of prohibiting sex offenders from entering school grounds, the underlying intention is to protect the health and safety of children (see e.g. Smith v Doe, 538 US at 93-94 [“where a legislative restriction is an incident of the State’s power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the *367 punishment” (internal quotation marks and citation omitted; emphasis added)]).
In Matter of Berlin v Evans (31 Misc 3d 919, 927 [Sup Ct, NY County 2011, Singh, J.]), the court concluded that one of the legislature’s intentions behind the 2005 act was “to increase punishment against convicted sex offenders.” The court in Berlin relied on the fact that “the definition of ‘school grounds’ is contained in the Penal Law” and that “Executive Law § 259-c (14) deals exclusively with parole,” “a form of punishment” (id.). This court disagrees. “The location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one” (Smith, 538 US at 94). Hence, the intention of the legislature “was to create a civil, nonpunitive regime” (id. at 96).
Statutory Effect
Under the second prong of the intents-effects test, courts “will reject the legislature’s manifest intent only where a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate the State’s intention to deem it civil” (Kansas v Hendricks, 521 US at 361 [internal quotation marks, citation and brackets omitted]; see also People v Parilla, 109 AD3d at 24). The following factors are considered in determining whether a statute is punitive in effect:
“[1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned” (Kennedy v Mendoza-Martinez, 372 US 144, 168-169 [1963] [citational footnotes omitted]; see also People v Parilla, 109 AD3d at 24).
These factors are “useful guideposts” (Smith v Doe, 538 US at 97 [internal quotation marks and citation omitted]). They “may often point in differing directions” (Kennedy, 372 US at 169), and “no one factor is determinative” (People v Parilla, 109 AD3d at 24).
*368 Status as a Parolee
The effects of the Executive Law § 259-c (14), as amended by the 2005 act, need to be analyzed in light of petitioner’s status as a parolee. “Because there is no federal or state constitutional right to be released to parole supervision before serving a full sentence, the state has discretion to place restrictions on parole release” (Matter of Williams v New York State Div. of Parole, 71 AD3d 524, 525 [1st Dept 2010]; see also People v Dyla, 142 AD2d 423, 439 [2d Dept 1988] [“(p)arolees . . . are allowed to remain outside the penal institution only on stated conditions”]). “A paroled . . . person shall, while on parole ... , be in the local custody of the Division of Parole until expiration of the maximum term or period of sentence” (9 NYCRR 8003.1 [a]) and “shall continue service of his or her sentence or sentences while on parole, in accordance with and subject to the provisions of the executive law and the correction law” (Penal Law § 70.40 [a]).
“The conditions of [a parolee’s] release, including those governing post-release supervision, shall be such as may be imposed by the state board of parole in accordance with the provisions of the executive law” (Penal Law § 70.40 [b]; see also Executive Law § 259-i [2] [a] [i]). “The releasee is expected to comply faithfully with all conditions specified in writing at the time of his release” (9 NYCRR 8003.1 [b]; verified answer, exhibits A-C [detailing various conditions of petitioner’s release on parole]).
Historically Considered Punishment
Petitioner argues that Executive Law § 259-c (14), as amended by the 2005 act, prevents him from living in Manhattan and a large portion of the outer boroughs (see e.g. Apr. 11, 2013 mem of law in support at 10). Petitioner claims that he is essentially banished from New York County, and that banishment is a traditional form of punishment (id.).
In support, petitioner provides a map of New York City, that was created for the Legal Aid Society, which marks locations that fall within the 1,000-foot radius of a school (verified petition, exhibits H, J). The map, however, is not fully reproduced (see id.). It shows only the borough of Manhattan in its entirety, large swaths of the Bronx and Queens, a small portion of Brooklyn, and does not show Staten Island at all (see id.). According to the map, most of Manhattan is within the 1,000-foot radius of a school, except certain areas of what appear to be Roosevelt Island, Chelsea, Stuyvesant Town, and the Financial *369 District. Most of the areas in the Bronx that are shown on the map are also within such a radius, except certain sections of what appear to be Hunts Point, Port Morris, Melrose, Pelham Parkway, and Williamsbridge neighborhoods.
However, according to the map, vast areas of Queens, including what appear to be areas within Long Island City, Hunters Point, Sunnyside, Maspeth, Middle Village, Elmhurst, and Corona neighborhoods, are not within the 1,000-foot radius of a school (see id..). In Brooklyn, certain areas in what appears to be the Greenpoint neighborhood are not within the 1,000-foot radius either. Accordingly, petitioner’s argument that he is banished from most of New York City is contradicted by the map that he himself provides (see id.).
Additionally, the restriction at issue is not similar to historical punishment of banishment. Banishment has been defined as: (1) “a punishment inflicted upon criminals, by compelling them to quit a city, place, or country, for a specific period of time, or for life”; (2) “exile”; and (3) “[a] punishment by forced exile, either for years or for life; inflicted principally upon political offenders” (United States v Ju Toy, 198 US 253, 269-270 [1905, Brewer, J., dissenting] [internal quotation marks omitted]; see also People v Parilla, 109 AD3d at 26 [“banishment involved state action in removing the offender from a locality”]). The statute does not require that petitioner abandon any particular geographic area. Neither has respondent removed petitioner from Manhattan or any other borough of New York City. The amendment merely places a temporary restriction, which expires at the completion of petitioner’s sentence, on how close he may live, in this case, to a school. It cannot be equated with a forced exile from one’s home or country (Ju Toy, 198 US at 269-270).
Aside from the condition, petitioner is subject to numerous other “geographic” conditions, which he does not challenge. For example, he may not, without prior knowledge and permission of his parole officer, “leave the five (5) boroughs of New York City” (verified answer, exhibit C [special conditions of release to parole supervision] ¶ 19). Neither may petitioner “enter, remain [in] or be within:” “any business where exotic or sexually explicit sexual activities are taking place,” “the location[ ] of [his] sexual crime[ ] at anytime,” and “any location that provides alcoholic beverages for public consumption” (id. ¶¶ 7, 18, 20; see also Matter of M.G. v Travis, 236 AD2d 163, 169 [1st Dept 1997] [imposition of similar conditions on the respondent parolee was *370 not arbitrary and capricious]). Therefore, the restriction at issue may not be likened to what historically has been considered banishment.
Affirmative Disability or Restraint
“Here, we inquire how the effects of the Act are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive” (Smith v Doe, 538 US at 99-100).
First, the court notes that, as a result of the 2005 act, petitioner did not have to serve additional time in prison, which is one of the primary concerns in analyzing a change in law affecting inmates eligible for parole (see e.g. Garner, 529 US at 255-256; see also Smith, 538 US at 99-100 [“(t)he Act imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint”]).
The court recognizes that the expanded definition of “school grounds,” as applied by respondent to petitioner’s case, may cause difficulty in obtaining housing in some areas of New York City.[7] However, this difficulty does not lead the court to conclude that the State is imposing punishment (see Smith, 538 US at 100; People v Parilla, 109 AD3d at 29 [“the fact that the restrictions are difficult and cumbersome is not enough to make them unconstitutional”]).
The court notes that, by comparison, pursuant to the New York State Sex Offender Registration Act (SORA) (Correction Law art 6-C) and its amendments, sex offenders are subject to various intrusive regulations,[8] which have been held not to impose punishment (see e.g. People v Parilla, 109 AD3d at 24-25 [“amendments (to SORA) . . . were aimed at improving the strength, efficiency and effectiveness of SORA as a civil statute, not at punishing sex offenders, and are not so punitive in effect as to negate the legislature’s intent”]).
*371 Second, petitioner has not explained why he needs to live in Manhattan. His wife lives in the Bronx[9] (verified petition ¶ 10), and his son lives in Philadelphia {id. ¶ 11). He claims that he had lived in Manhattan for over 25 years before imprisonment {id. ¶ 7); that his friend lives in Manhattan (id. ¶ 10); and that his parole officer, as well as his sex offender and substance abuse treatment programs are in Manhattan {id. ¶¶ 17-18). However, petitioner does not explain why he cannot travel to these people and services from the outer boroughs of New York City.
In Berlin, prior to his imprisonment, the petitioner had resided in the same apartment in Manhattan for more than 40 years, and, while in prison, he “continued paying rent for his apartment, and he planned to return to his apartment as soon as he was released from prison” (Berlin, 31 Misc 3d at 920). New York State Division of Parole denied the petitioner’s request to return to his apartment while on parole, because the apartment was within 1,000 feet of a school (id. at 921-922). Similarly, in State v Pollard (908 NE2d 1145, 1150 [Ind 2009]), as a result of a new statute, a sex offender was not allowed to live in his own house, in which he lived for approximately 20 years, because of its proximity to a school.
Unlike the petitioner in Berlin or the respondent in Pollard, petitioner here has not alleged that he owns or has been renting a particular apartment in Manhattan, to which he would like to return, but is prevented by respondent from returning there because of the condition. Petitioner here prefers to live in Manhattan, but has not articulated a particular property interest located in Manhattan that he would have to abandon as a result of the condition. Hence, the statute does not impose an affirmative disability or restraint to the extent that it would render its effects punitive.
Existence of a Nonpunitive Purpose and Excessiveness with Respect to it
As to the existence of a nonpunitive purpose, the 1,000-foot restriction is rationally connected to a legitimate purpose of protecting children {see e.g. Smith, 538 US at 103-105).
Petitioner contends that the statute is excessive with respect to this nonpunitive purpose, because it does not require or permit any individual assessment of an offender’s dangerousness. “The question is whether the regulatory means chosen *372 are reasonable in light of the nonpunitive objective” {id. at 105).
The 2005 act expanded the definition of school grounds to either school grounds themselves or a 1,000-foot buffer zone around a school {see L 2005, ch 544, § 2; see also Executive Law § 259-c [14]; Penal Law § 220.00 [14]). Although it expanded the spatial/territorial definition, the statute remains limited only to certain sex offenders already serving a sentence who are paroled or conditionally released, and whose victim was under 18 years old.
First, Executive Law § 259-c (14), when read as a whole, differs significantly from a statute subject to analysis in Commonwealth v Baker (295 SW3d 437, 444-445 [Ky 2009], cert denied 559 US 992 [2010]), on which petitioner relies and which was discussed in Berlin (31 Misc 3d at 928-929). In Baker, all registered sex offenders, not only those on probation or conditional release, were prohibited from residing within 1,000 feet of a school (id. at 440-441). The statute here applies only to certain sex offenders who were “released on parole or conditionally released” {see Executive Law § 259-c [14]; Penal Law § 220.00 [14]).
Moreover, given the nature of petitioner’s crime, he might be reasonably viewed as a potential threat to children (cf. Baker, 295 SW3d at 446 [“(t)he record before us does not reveal whether or not Respondent might be a threat to children and to public safety”]). The statute, by essentially creating a buffer around schools, rationally seeks to lessen petitioner’s contact with children.
Second, the United States Supreme Court held that “[t]he State’s determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause” (Smith, 538 US at 104). Only where a restraint on an individual is of great magnitude, such as involuntary confinement, is individual assessment appropriate (see id. [discussing Kansas v Hendricks (521 US at 357-358, 364), where the United States Supreme Court dealt with a state statute requiring involuntary confinement of offenders who had committed a sexually violent offense and suffered from a mental abnormality or personality disorder, upon completion of their prison term]). Here, the statute imposes much milder restriction on petitioner. Accordingly, the regulatory scheme is not excessive with respect to the nonpunitive purpose.
*373 Remaining Factors
The remaining factors are: whether the regulatory scheme comes into play only on a finding of scienter; whether its operation will promote the traditional aims of punishment—retribution and deterrence; and whether the behavior to which it applies is already a crime (see Mendoza-Martinez, 372 US at 168).
The statute here does not require a finding of scienter in order to impose the restriction. The statute is not retributive. It does not punish a sex offender’s past conduct, but seeks to defend children from the risk of future recidivism (see e.g. Parilla, 109 AD3d at 23). “The regulatory scheme applies only to past conduct, which was, and is, a crime,” and the imposition of the condition pursuant to Executive Law § 259-c (14) is “not predicated upon some present or repeated violation” (Smith, 538 US at 105).
Accordingly, the Executive Law § 259-c (14), as amended by the 2005 act, is not so punitive in its effect as to negate the legislature’s intent, and its retroactive application does not violate the Ex Post Facto Clause.
B. Substantive Due Process
Petitioner further argues that the statute deprives him of a liberty interest. “The Due Process Clause of the Fourteenth Amendment [of the United States Constitution] states: ‘nor shall any State deprive any person of life, liberty, or property, without due process of law’ ” (Collins v Harker Heights, 503 US 115, 125 n 8 [1992]).
“The traditional test requires only that the classification be rationally related to a permissible goal. However, if a fundamental personal right is involved, a classification can be upheld only if it furthers a compelling state interest” (King v New Rochelle Mun. Hous. Auth., 442 F2d 646, 648 [2d Cir 1971] [citational footnote omitted]; see also Reno v Flores, 507 US 292, 301-302 [1993] [the infringement on a fundamental liberty interest must be “narrowly tailored to serve a compelling state interest” (citations omitted)]). “Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field” (Reno, 507 US at 301-302 [internal quotation marks, citations and brackets omitted]).
“Section 6 of article I of [the New York] Constitution mandates that ‘No person shall be deprived life, liberty or prop *374 erty without due process of law’ ” (Cooper v Morin, 49 NY2d 69, 79 [1979], cert denied 446 US 984 [1980]). “All infringements of liberty by the State must be tested under the due process clause, but where no fundamental right is infringed legislation is valid if it is rationally related to legitimate government interests” (People v Knox, 12 NY3d 60, 67 [2009], cert denied 558 US 1011 [2009]).
“[W]here a statute is challenged on nonprocedural grounds as violative of due process of law we have consistently asked the question whether there is some fair, just and reasonable connection between it and the promotion of the health, comfort, safety and welfare of society. In approaching this question, the court has recognized that as a matter of substantive law every legislative enactment is deemed to be constitutional until its challengers have satisfied the court to the contrary. There is generally a very strong presumption that the Legislature has investigated and found the existence of a situation showing or indicating the need for or desirability of the legislation” (Montgomery v Daniels, 38 NY2d 41, 54 [1975] [internal quotation marks and citations omitted]).
However, the parole statute does not create a liberty interest. (See Siao-Pao v Connolly, 564 F Supp 2d 232 [SD NY 2008].)
Right to Live Where One Chooses
Petitioner formulates the right at issue as the right to live where one chooses, but concedes that it is not fundamental, and that his posited liberty interest is subject to rational basis review (reply mem of law at 24). Moreover, petitioner and other parolees enjoy only conditional liberty, which is dependent on observance of conditions (see e.g. Griffin v Wisconsin, 483 US 868, 874 [1987]; see also United States v Grimes, 225 F3d 254, 258 [2d Cir 2000] [“parolees enjoy even less of the average citizen’s absolute liberty than do probationers” (internal quotation marks omitted)]; People v Hale, 93 NY2d 454, 459 [1999] [parole status “falls under a ‘special needs’ category that may justify departures from the customary constitutional standards that apply in other settings”]).
Right to Travel
Petitioner also argues that application of Executive Law § 259-c (14) to him interferes with his right to travel freely within the State of New York.
*375 The right to interstate travel is a fundamental constitutional right (see e.g. Saenz v Roe, 526 US 489, 498 [1999]), “an aspect of liberty that is protected by the Due Process Clauses of the Fifth and Fourteenth Amendments” (Jones v Helms, 452 US 412, 418-419 [1981]). It is unclear though whether intrastate travel is also a fundamental right (see Memorial Hospital v Maricopa County, 415 US 250, 256 [1974] [declining to address the question of constitutional distinction between interstate and intrastate travel]). Even if intrastate travel is a fundamental constitutional right (see King v New Rochelle Mun. Hous. Auth., 442 F2d at 648), petitioner, as a parolee, does not enjoy an absolute right to travel (see People v Hale, 93 NY2d at 459 [parole status “involves conditional as opposed to absolute liberty”]; see also People v Coleman, 11 Misc 3d 1019, 1021-1022 [Sup Ct, Kings County 2006] [criminal court did not deny defendant his constitutional right to travel by temporarily prohibiting him from entering New York City as a condition of both a conditional discharge and an order of protection]). Analysis
Accordingly, under the United States Constitution, the appropriate test for a parolee is whether the infringement, on petitioner’s opportunity to live where he chooses and to travel, is rationally related to a permissible goal (see King v New Rochelle Mun. Hous. Auth., 442 F2d at 648). Under the New York Constitution, petitioner’s “challenge is to be viewed as presenting two inquiries: in enacting [the 2005 act] was the Legislature acting in pursuit of permissible State objectives and, if so, were the means adopted in [the 2005 act] reasonably related to the accomplishment of those objectives?” (Montgomery v Daniels, 38 NY2d at 54.)
As previously discussed, in enacting the 2005 act, the legislature was acting in pursuit of protecting children from harm posed by paroled sex offenders, which is a permissible state objective.
Petitioner’s underlying crime involved the rape of a minor. There is a concern about petitioner’s “future chances of recidivism” with respect to children (Matter of Williams v New York State Div. of Parole, 71 AD3d at 526). By creating a 1,000-foot buffer around a school, the restriction seeks to protect children from harm by petitioner’s “being at large” (see Griffin v Wisconsin, 483 US at 875). The restriction is temporary, ending upon completion of petitioner’s term.
Moreover, the statute does not impose strict liability. Incidental contact with the 1,000-foot zone of exclusion, when walking *376 between two permissible places (e.g., home and subway) does not alone constitute a violation. First, a violation would require proof that the parolee knowingly violated the statute. The State has the burden of proving any parole violation, including the knowledge element. Second, if a parolee knows that he or she would be traversing the zone, it is not unreasonable to require the parolee to detour to avoid it. The statute does not, on its face, unreasonably infringe upon any constitutionally protected interest of the parolee. Any inchoate burden to petitioner is now speculative and might well be averted, in the first instance, by planning and prior arrangement with his parole officer.
Given the nature of petitioner’s crime and his status as a parolee, the temporary restriction against entering within 1,000 feet of a school is rationally and reasonably related to the permissible and legitimate state objective of protecting children. Accordingly, the statute does not violate petitioner’s substantive due process rights.
Conclusion
For the foregoing reasons, it is hereby adjudged that the petition is denied and the proceeding is dismissed; and it is further adjudged and declared that Executive Law § 259-c (14), as amended by Laws of 2005 (ch 544, § 2), is not unconstitutional on its face or as applied to petitioner.

. Petitioner does not challenge the administrative decision of respondent to apply this restriction to him. Rather, he argues that Executive Law § 259-c (14) is unconstitutional.

. Section 259-c of the Executive Law details the functions, powers, and duties of the State Board of Parole.

. As part of SARA, subdivision (4-a) was added to Penal Law § 65.10 and subdivision (9) was added to Correction Law § 272, subjecting probationers and inmates about to be conditionally released, whose offenses are the same as those of parolees in subdivision (14) of Executive Law § 259-c, to the same condition of “refrain[ing] from knowingly entering into or upon any school grounds” (L 2000, ch 1, §§ 7, 9).

. As relevant to this petition, the legislature deleted the reference to paragraph (a) of Penal Law § 220.00 (14), thereby incorporating the entire subdivision (14) of Penal Law § 220.00 into Executive Law § 259-c (14) (L 2005, ch 544, § 2). Subdivision (4-a) of Penal Law § 65.10 (probationers) and subdivision (9) of Correction Law § 272 (inmates to be conditionally released) were also amended, incorporating the entire subdivision (14) of Penal Law § 220.00 as the definition of “school grounds” (L 2005, ch 544, §§ 1, 3).

. Hairline fracture in his back, poor circulation in his feet and legs, pinched shoulder nerve, arthritis in his hands, and successfully treated prostate cancer that requires follow-up examinations twice a year. Petitioner provides no records from a medical provider confirming these ailments.

. Although both SARA and the 2005 act were enacted after petitioner’s conviction, petitioner challenges only the constitutionality of the 2005 act to the extent that it expanded the definition of “school grounds.”

. The court understands that affordable housing is difficult to locate in many areas of New York City and especially in Manhattan (New York County). Petitioner’s stated requirements ($600 or less per month, few stairs and close to a subway) are themselves very limiting irrespective of his parole status and the statutory requirements of SARA.

. Under SORA and its subsequent amendments, level one sex offenders must register for 20 years, those designated level two and level three must register for life, and the following information about level two and three sex offenders is made available on the Internet: “their name, age, photo, home address, work address, crime, modus of operation, type of victim targeted, and any college or university in which they are enrolled” (Parilla, 109 AD3d at 25, 27).

. Petitioner has not requested permission to live at the same address as his wife.